896 A.2d 523

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**James T. WILLIAMS, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 10, 2004.

Decided April 21, 2006.

554

556

558

560

564

Daniel Silverman, Esq., for StandCounsel.

James Williams, for James T. Williams.

Maria Lisa Dantos, Esq., Amy Zapp, Esq., Allentown, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER, and BALDWIN, JJ.

## *OPINION*

Justice EAKIN.

On August 21, 2001, appellant, James T. Williams, a.k.a. "Mathematics," [1] was convicted of first degree murder, robbery, and conspiracy to commit robbery,[2] and was sentenced to death. This direct appeal arises pursuant to 42 Pa.C.S. § 9711(h)(1) (automatic direct appeal from death sentence to this Court). We affirm.

1. All aliases mentioned are the names by which the circle of friends were known in their neighborhoods; each testified at trial using the aliases cited.

2. 18 Pa.C.S. § 2502(a); *id.*, § 3701(a)(1) (inflicting serious bodily injury); *id.*, § 903(a)(1) and (2), respectively.

On May 29, 1995, Richard White, a.k.a. "Pookie," telephoned Lamar Peterson, a friend of appellant, seeking to buy a large quantity of marijuana to replenish the inventory for his drug dealing operation. Peterson concluded that if White had sold all his marijuana, White would have a significant amount of cash on hand. Peterson suggested to appellant that they rob White through a "stinger;" Peterson would engage White in a drug transaction, during which appellant would suddenly appear and rob them both. Peterson and appellant would reconnect later and share in the pelf.

Peterson, appellant, and Curtis French set out to find White, but Peterson could not remember the exact location of White's apartment. The three returned to Peterson's apartment where they informed Ralph Logan, a.k.a. "Rah–Rah," and Luis Avila, a.k.a. "T–Bone," of the plan. The group decided to make another attempt to find White. This time, Avila called White and informed him he would soon drop by to purchase marijuana. Avila, Logan, and appellant set out on another robbery attempt; however, this too was unsuccessful after the trio went to the wrong apartment. Again, appellant and his cohorts returned to Peterson's apartment.

Giving the "stinger" one last try, Avila called White again and ascertained his apartment's exact location; appellant, Avila, and Logan again set out to rob him. White was on his balcony when he saw the trio approaching; White tucked a pistol in the rear of his shorts and headed to the street, where he encountered the group. Appellant demanded White take him to his apartment and hand over his cash. When White refused, pleading with his arms in the air that his children were inside sleeping, appellant pulled out a MAC 10 automatic weapon and fired two bullets into White's chest and a third into his thigh as he fell to the ground.

With White lying in the street, the group fled back to Peterson's apartment. Upon their arrival, appellant informed Peterson that because White was uncooperative, he "wetted him lovely," *i.e.*, appellant shot him. N.T. Trial, 7/20/01, at 1891. The other robbers also testified that appellant bragged about shooting White.

Later that summer, Peterson and appellant were arrested in Baltimore by the FBI for an unrelated bank robbery. Facing federal charges, Peterson told authorities of appellant's role in the robbery and murder of White. Avila, French, and Logan were also arrested and each corroborated Peterson's account. The three later testified appellant used the same weapon in many subsequent bank robberies. Photographs in Peterson's possession at the time of his arrest depicted appellant, Peterson, French, and Logan; one showed appellant posing with the MAC 10 used to kill White.

In November, 1996, appellant was convicted in federal court of robbery and was sentenced to 687 months federal incarceration. Having already filed first degree murder charges against appellant, Lehigh County prosecutors monitored appellant's federal prosecution and attended portions of his federal trial. N.T. Pretrial Hearing, 2/03/00, at 50. Appellant was ultimately transferred to a federal prison in Colorado; Lehigh prosecutors sought extradition. This request was delayed because appellant had previously filed homicide charges pending against him in New Jersey, which was also attempting to secure him. Eventually appellant was transferred to Lehigh County.

Despite repeated warnings and recommendations from the court to the contrary, appellant represented himself during pretrial hearings and at trial. At trial, and with standby counsel assisting when appellant permitted, appellant attempted to undermine the credibility of his accusers, but took the opportunity to personally attack Commonwealth prosecutors, officers, and criminal justice personnel. *See* N.T. Pretrial Hearing, 10/12/00, at 4 (appellant repeatedly slurred one black prosecutor as "house n* * * *r" and lead prosecutor as conspirator and liar).

Since the majority of the Commonwealth's witnesses were co-conspirators in numerous robberies and were currently serving time for other crimes, appellant harangued each about the reduced sentences they received in exchange for their cooperation with the Commonwealth. *See, e.g.,* N.T. Trial, 7/23/01, at 2197–98, 2205–09, 2213–14; *id.,* 7/24/01, at 2407–09;

*id.,* 7/27/01, at 3307–08. Appellant suggested French was the triggerman in White's murder, and maintained a statewide conspiracy was afoot wherein the Lehigh County District Attorney's Office, numerous police departments, prison staff employees, and even appointed standby defense counsel were acting in concert.

Police came into possession of the murder weapon after a failed robbery attempt by appellant, Peterson, French, and another individual. As was their typical strategy, the group tried to rob a drug dealer but were unsuccessful when the dealer brandished a weapon; French dropped the machine gun as the three fled for their lives. Ballistics tests revealed the gun recovered was used in White's murder. This same weapon was also linked to the bank robbery appellant was convicted of in federal court. The car used in the perpetration of White's murder was also tracked down by police; it had been rented by an associate of appellant, and had a dent in the fender consistent with the strike of a bullet. Testimony revealed that when appellant shot White, one of the bullets exited White's body and ricocheted off the getaway car. *Id.,* 7/24/01, at 2539–40.

In addition to the physical evidence, the Commonwealth offered expert medical testimony consistent with its other witnesses' version of the killing, particularly the fact that White was shot while his arms were raised. *Id.,* 7/23/01, at 2270, 2293–94. The Commonwealth also presented David Miller, an inmate at Lehigh County Prison, who testified appellant admitted to him he had killed somebody and was seeking Miller's legal advice concerning his case. *Id.,* 7/26/01, at 3078.

Besides soliciting Miller's assistance, appellant spoke to another inmate, Louis Washington, about having one of Washington's family members provide an alibi for appellant's whereabouts on the night of White's murder. *See id.,* 7/30/01, at 3584–87 ("So then [appellant] offered me some money, and he offered my family some money to have my mother be his alibi...."). Coached by appellant, this woman was to testify appellant was with her during the homicide, and because she

had no criminal record or prior involvement with appellant, her story would be believed over appellant's criminal cohorts. After being threatened by appellant, Washington told the Commonwealth of appellant's fabrication plans. As a result, and at the meeting arranged by appellant to "go over" this testimony, Washington's mother was portrayed by state Trooper Regina Stafford; the Commonwealth had previously secured warrants to record the conversations. During the conversation, appellant orchestrated a time sequence placing him with Washington's mother at the time of White's murder, and informed her exactly what she was expected to say.

At trial, appellant called Washington to authenticate an affidavit exonerating appellant which Washington had signed; Washington testified he signed the affidavit only after being threatened. N.T. Trial, 7/30/01, at 3549–62. Appellant attacked Washington's credibility and the suggested alibi fabrication story; on cross-examination, the Commonwealth further explored the fabrication story. After appellant again tried to discredit Washington by alleging he invented the alibi story to curry favor with the Commonwealth, the prosecution was granted permission, in rebuttal, to verify Washington's version of events. Officer Stafford testified to the alibi plot, and the tape recording of the conversation was played for the jury. Appellant was convicted on all charges.

Appellant again represented himself during the penalty hearing, asking the jury to consider his character and the circumstances surrounding the crime, 42 Pa.C.S. § 9711(e)(8), and his allegedly minor criminal record, id., § 9711(e)(1). Appellant argued he was not a violent person and made repeated attacks on the character of the victim, i.e., the victim was armed, a neglectful parent, and a notorious drug dealer. The Commonwealth offered the jury two aggravating circumstances, namely, appellant's history of violent felonies, id., § 9711(d)(9), and that appellant committed the murder while in the course of a felony, id., § 9711(d)(6). The jury found the Commonwealth proved both aggravating circumstances, and rejected all appellant's proposed mitigating evidence; appellant was sentenced to death.

Reordered, but taken verbatim from his brief, these issues are raised by appellant: [3]

**Pretrial:**

Did the trial court err in denying appellant's Motion to Dismiss under former Rule 1100 and the Interstate Agreement on Detainers where trial commenced approximately five (5) years after appellant was charged and over 180 days after his request for final disposition of the charges pending against him, where appellant was in custody the entire time and where appellant was available to the Commonwealth had its agents promptly instituted the proper procedures to secure his presence?

**Jury Selection:**

Was appellant denied due process and a fair penalty phase under both the state and federal constitutions when the trial prosecutor repeatedly misled every venireperson, including those who ultimately comprised the *petit* jury, regarding the "mandatory" nature of the death sentence (contrary to 25 years of United States Supreme Court precedent) where the trial court did not correct these errors and in fact compounded them and the trial prosecutor repeated them in her penalty phase closing argument?

**Guilt Phase:**

Did the trial court err in admitting the testimony of Corporal Regina Stafford, who was sent in to appellant's jail during the pre-trial stage by pretending to be a civilian witness out to help appellant in order to obtain incriminating statements from appellant, in the absence of *Miranda[v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] warnings or a waiver of counsel, at a time when formal charges had already been brought and appellant had the right to be represented by counsel, or because appellant lacked the competency to waive counsel, in violation of the Sixth and Fourteenth amendments to the United States Constitution and the rule of *Massiah v.*

---

**3.** It deserves repeating the often-cited maxim: "the number of claims raised in an appeal is usually in inverse proportion to their merit...." *Commonwealth v. Ellis*, 534 Pa. 176, 626 A.2d 1137, 1140 (1993) (citation omitted).

*United States* [, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) ]?

Was appellant denied his state and federal rights to due process when the Commonwealth violated the trial court's ruling limiting the admissibility of "other crimes" evidence to two (2) relevant crimes and proceeded to introduce overwhelming evidence of appellant's alleged participation in several additional violent felonies completely unrelated to this case, and where the trial court failed to issue cautionary instructions (assuming the evidence was admissible for a limited purpose)?

Did the trial prosecutor deliberately mislead the 'jury in violation of appellant's state and federal due process rights when she repeatedly stated that all of appellant's co-conspirators "were not murderers" when, even under the Commonwealth's theory of prosecution and the co-conspirators' version of their own involvement, they were fully guilty of second-degree murder having participated in a killing that occurred during a robbery, where such a mischaracterization necessarily created the erroneous impression that the co-conspirators-turned-Commonwealth witnesses were not receiving as a benefit for their cooperation immunity from prosecution for murder when in truth they were?

Did the trial prosecutor improperly vouch for the credibility of her witnesses in violation of appellant's state and federal due process rights when she incessantly introduced evidence that the plea agreement of each witness required him "to tell the truth," thereby placing the official imprimatur and force and weight of the state behind the testimony of each witness?

Did the Commonwealth fail to disclose all of the benefits it provided its career criminal witnesses in violation of appellant's state and federal due process rights and the rule of *Brady v. Maryland* [, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] and its progeny?

Did the trial court err in failing to instruct the jury on accomplice liability as to first degree murder where part of

appellant's defense was that co-conspirator Curtis French was the actual shooter?

Did the trial prosecutor commit misconduct and thereby deprive appellant of a fair trial and due process when she (a) exhorted the jury to disregard its obligation to apply the law by erroneously instructing it that "this case is not about the law; if you find it's him, it's murder one" when the facts were at least equally consistent that this was second-degree murder; (b) deliberately misled the jury into believing that her career criminal witnesses did not receive "deals" in state court for their testimony when in fact each witness was granted immunity from prosecution on this murder, two of her witnesses were granted immunity from prosecution on somewhere between 20–60 other robberies and one witness was granted immunity from prosecution on perjury and obstruction of justice charges for lying to the grand jury in this matter; and (c) mischaracterized the applicable law by instructing the jury that the "deals" her witnesses received were "not relevant" to its decision-making when the law provides that such evidence is highly relevant?

Is appellant competent to represent himself on this appeal, was appellant incompetent to represent himself at trial and did the trial court err in denying appellant funds to retain the expert witnesses necessary to establish his incompetence?

**Penalty Phase:**

Was appellant denied his state and federal rights to due process when the Commonwealth introduced at the penalty phase evidence of appellant's (a) alleged participation in unrelated robberies for which he was never convicted and (b) status as a parole violator, where such evidence amounts to inadmissible non-statutory aggravation?

Was appellant denied his state and federal rights to due process when the jury at the penalty phase was permitted to consider "other crimes" and "bad acts" evidence previously introduced at the guilt phase, where such evidence amounts to inadmissible non-statutory aggravation?

Was appellant denied the protections of the state and federal privilege against self-incrimination and due process clause when the prosecutor expressly commented on appellant's failure to express remorse, in violation of the rule of *Griffin v. California* [, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) ] and *Lesko v. Lehman* [, 925 F.2d 1527 (3d Cir.1991) ]?

Did the trial court err in failing to instruct the jury that in order for it to consider the aggravating circumstance that appellant "committed a killing" in the perpetration of a felony, it must unanimously agree that appellant was the actual killer, an issue not necessarily foreclosed by its guilty-phase verdict?

Was appellant's April, 2000 waiver of counsel sufficiently valid to apply to the September 2001 penalty phase proceedings where (1) the colloquy to determine whether the waiver was valid was completely deficient as to capital sentencing issues rendering the waiver unknowing and (2) the earlier waiver, assuming it was valid at some point, expired at the conclusion of the guilt phase six weeks earlier or at some earlier point?

Was the evidence insufficient as a matter of law to make out the aggravating circumstance of "prior felony convictions" under 42 Pa.C.S. § 9711(d)(9) where there exists no evidence in the record to show that appellant's prior convictions were in fact "felonies"?

Did the trial court err in precluding the mitigating evidence that appellant's co-conspirators were given unprecedented lenient treatment for their role in this murder and exceedingly lenient sentences on their outstanding bank robbery charges in exchange for their cooperation against appellant, in violation of the rule of *Lockett v. Ohio* [, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ]?

Did the cumulative effect of some or all of the errors raised herein deprive appellant of a fair trial and due process?

 Although appellant does not challenge the sufficiency of the evidence underlying his first degree murder conviction,

in all capital cases, we self-impose such a duty and review the evidence supporting the conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982). This review is premised on whether the evidence, viewed in the light most favorable to the Commonwealth, and all reasonable inferences arising therefrom, is sufficient to establish the elements of the offense beyond a reasonable doubt. *Commonwealth v. Boxley*, 575 Pa. 611, 838 A.2d 608, 612 (2003) (citations omitted).

First degree murder is a criminal homicide committed by an intentional killing. 18 Pa.C.S. § 2502(a). To sustain a first degree murder conviction, the evidence must establish: (1) a human being was unlawfully killed; (2) the defendant did the killing; and (3) the killing was committed in a willful, deliberate, and premeditated way. *Id.*, § 2502(a), (d); *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 773 (2004); *Commonwealth v. Cuevas*, 574 Pa. 409, 832 A.2d 388, 392–93 (2003). "A specific intent to kill may be proven by circumstantial evidence; it may be inferred by the use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000) (citing *Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308, 311 (1995)).

The evidence admitted at trial established that appellant and his cohorts attempted numerous times to locate White in order to rob him; appellant brought along an automatic weapon to effectuate the robbery and for any contingencies. When the three men found White, appellant approached him and demanded money and entrance into his apartment. The evidence shows that White pled with appellant not to enter his apartment and endanger his sleeping children. For not following his demands, appellant shot White once in the thigh and twice in the chest, killing him. These actions, coupled with appellant's boastful admission minutes after the killing that he "wetted [White] lovely" are sufficient to sustain appellant's first degree murder conviction.

As his own counsel, and admittedly unversed in trial and appellate advocacy, appellant failed at trial to object to

almost all instances of error he now alleges. Normally, this would be fatal to his claims because *pro se* defendants are held to the same standards as licensed attorneys. Electing to proceed *pro se* does not excuse issue preservation, *see Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 736 (2004), and "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). In *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), this Court abolished relaxed waiver, but "declin[ed] to apply the new approach to pending cases already briefed or in the process of being briefed. . . ." *Id.*, 827 A.2d at 403. Since appellant's brief was pending at the time *Freeman* was decided, relaxed waiver applies and each of his issues will be addressed.

■■■■■ Appellant claims all his charges should have been dismissed because the Commonwealth violated Pa.R.Crim.P. 1100 [4] (renumbered Pa.R.Crim.P. 600), the speedy trial rule, and the Interstate Agreement on Detainers Act (IAD).[5] Spe-

4. Former Rule 1100 provided, in pertinent part: "Trial in a court case in which a written complaint is filed against the defendant, when the defendant is incarcerated on that case, shall commence no later than 180 days from the date on which the complaint is filed." Pa.R.Crim.P. 1100 (renumbered Pa.R.Crim.P. 600).

5. The IAD is an agreement between 48 states, the District of Columbia, Puerto Rico, and the Virgin Islands that establishes procedures for the transfer of prisoners incarcerated in one jurisdiction to the temporary custody of another jurisdiction which has lodged a detainer against them. Unlike a request for extradition, which is a request that the state in which the prisoner is incarcerated transfer custody to the requesting state, a detainer is merely a means of informing the custodial jurisdiction that there are outstanding charges pending in another jurisdiction and a request to hold the prisoner for the requesting state or notify the requesting state of the prisoner's imminent release.

Article IV of the IAD provides the procedure by which the prosecutor in the requesting state initiates the transfer:
(a) The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with Article V(a) hereof upon presentation of a written

cifically, appellant argues the Commonwealth failed to take adequate steps to secure his presence in Pennsylvania, and after he was finally transferred there October 4, 1999, it took almost two years for his trial to commence. The Commonwealth, appellant posits, had only 120 days from his arrival in Pennsylvania under the IAD, *see* 42 Pa.C.S. § 9101, Article IV(c), and 180 days under the speedy trial rule, *see* Pa. R.Crim.P. 600(A)(2), to begin his trial. Appellant correctly cites the pertinent provisions; however, he conspicuously omits from each contention that a trial court has the discretion to extend the deadline or exclude days "for good cause shown." *See Commonwealth v. Montione,* 554 Pa. 121, 720 A.2d 738, 740 (1998) (IAD "tolled 'whenever and for as long as the prisoner is unable to stand trial, as determined by the court. . . .' ") (quoting 42 Pa.C.S. § 9101, Articles IV and VI); Pa.R.Crim.P. 600(C) (excludable time from speedy trial rule). This gap in appellant's reasoning is dispositive.

In *Commonwealth v. Davis,* 567 Pa. 135, 786 A.2d 173 (2001), this Court upheld the dismissal of charges against a defendant for the Commonwealth's failure to commence his trial within the IAD's 120–day deadline, and particularly, "the Commonwealth did not offer good cause regarding why [a]ppellee was not brought to trial within this time. . . ." *Id.,* at 175. Because this good cause element was absent, discharge was necessary. Conversely, where the Commonwealth demonstrates it exercised due diligence in bringing a defendant to trial outside the speedy trial rule's time limit, a trial court will exclude such time in calculating a defendant's Rule 600 deadline. Pa.R.Crim.P. 600(G) ("If the court, upon hearing, shall

request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated. . . .

\* \* \*

(c) In respect of any proceeding made possible by this article, trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state. . . .

42 Pa.C.S. § 9101, Article IV(a), (c). If the requesting state returns the prisoner to the transferring state without having tried him, or should the 120 days pass without a trial, all charges against the prisoner will be dismissed with prejudice, absent good cause shown. *See Commonwealth v. Merlo,* 242 Pa.Super. 517, 364 A.2d 391 (1976).

determine that the Commonwealth exercised due diligence and that the circumstances occasioning the postponement were beyond the control of the Commonwealth, the motion to dismiss shall be denied and the case shall be listed for trial on a date certain.").

Here, the trial court found appellant was unavailable while in federal custody for IAD and speedy trial rule purposes, and with delays specifically attributed to him and court procedures beyond the Commonwealth's control, appellant's motion to dismiss had no merit. The court reasoned:

Thus, the entire period from February 4, 1999 [the date appellant filed his IAD notice with Lehigh County authorities that he would not contest transportation there], was beyond the control of the prosecutor, who exercised due diligence within that period to obtain [appellant]. In other words, for purposes of Rule [600], only 140 days have elapsed toward the Rule [600] rundate.

Trial Court Opinion, 3/26/01, at 14 (citation omitted). This assessment is supported by the record, and appellant's attempt at dismissal was properly rejected.

■ Appellant alleges the jury pool was corrupted during *voir dire* and again during the prosecutor's closing statement to the jury, because the court suggested, and permitted the Commonwealth to argue, that in certain circumstances, the death penalty is mandatory. Appellant highlights the following instructions during *voir dire:*

The Court: What we are here to do is—The law in this Commonwealth recognizes the death penalty, and in certain cases, mandates its imposition.

\* \* \*

The Court: Okay, and do you also understand that the Legislature has also said that in certain circumstances, the death penalty is required?

N.T. *Voir Dire,* 7/10/01, at 241, 451. Additionally, the prosecutor in her penalty phase closing argument stated: "As I told you during *voir dire,* this point might come where you may be

faced with the law that says that in this instance, your sentence must be death." N.T. Trial, 9/4/01, at 4312.

Appellant posits such death qualification directives leave jury members with the indelible belief that they are required to impose a death sentence, regardless of any reservations they may have concerning the evidence presented. Appellant's argument is unavailing, because the prosecutor's and trial court's recitation of the law was correct, and each instruction was conditioned upon the jury's findings and its balancing of aggravating and mitigating circumstances. N.T. *Voir Dire,* 7/10/01, at 227; N.T. Sentencing, 9/4/01, at 4309–4314, 4324–4331.

██ The General Assembly has ensured by statute that, in a capital case, the jury's "verdict *must* be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in [42 Pa.C.S. § 9711](d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." 42 Pa.C.S. § 9711(c)(1)(iv) (emphasis added). This Court has interpreted this statute as mandatory upon a jury, and a juror who will not impose the death penalty when mandated may be removed for cause. *See Commonwealth v. Morales,* 549 Pa. 400, 701 A.2d 516, 523 (1997) ("as long as there exists one aggravating circumstance and no mitigating circumstances, as is the case here, the death penalty is required as a matter of law."); *Commonwealth v. Jasper,* 531 Pa. 1, 610 A.2d 949, 952 (Pa.) (juror is properly excluded whenever juror's views on capital punishment would prevent or substantially impair performance of his duties as juror in accordance with his instructions and oath).

██ Thus, the trial court was required to instruct the jury on the current state of death penalty jurisprudence in this Commonwealth and ensure that it would be followed; this was done. Further, a prosecutor is permitted, during *voir dire,* to "death qualify" a jury to ensure that it will uphold the prescribed law. *See Lockhart v. McCree,* 476 U.S. 162, 174, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("death qualification"

does not contravene U.S. Constitution); *Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203, 216 (1997) ("death qualification process is consistent with the guarantees of a trial"); *Commonwealth v. Lambert*, 529 Pa. 320, 603 A.2d 568, 575–76 (1992), *opinion superseded on denial of reconsideration Commonwealth v. Lambert*, 568 Pa. 346, 797 A.2d 232 (2001) (this Court has "repeatedly struck down" challenges to death qualification of juries). The trial court's statements and the prosecutor's inquiries into the jurors' ability to uphold the death penalty were proper, and appellant's claim fails.

 Appellant argues the trial court erred by permitting the Commonwealth to play the tape recording of his conversation with Trooper Stafford and allowing her to testify to appellant's alibi-making scheme. Appellant alleges the conversation was unlawful because he was not given *Miranda* warnings, and the episode took place without the benefit of counsel; absent a valid waiver of counsel, post-indictment police interrogations are prohibited. *See Massiah*, at 205, 84 S.Ct. 1199 ("Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.") (citation omitted); *Commonwealth v. Franciscus*, 551 Pa. 376, 710 A.2d 1112, 1119 (1998) ("harvest[ing]" information via jailhouse informant from defendant post-indictment, and without counsel, violates Pa. Const. art. 1, § 9).

 Although "[i]n all criminal prosecutions the accused hath a right to be heard by himself . . .," Pa. Const. art. 1, § 9, this Court has repeatedly admonished *pro se* advocacy in capital cases, and warned defendants that they will be held to the same level of knowledge and standards as those trained in the law. *See Bryant*, at 740 ("Appellant may not rely on his own lack of legal expertise as a ground for a new trial . . . .") (citing *Faretta v. California*, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)); *Commonwealth v. Szuchon*, 506 Pa. 228, 484 A.2d 1365, 1377 (1984) (as *pro se* litigant, defen-

dant "must be prepared to accept the consequences of his stubborn obstinance."). Further, "[i]t is well established that a defendant can waive the right to self-representation after asserting it." *Bryant*, at 737 (citation omitted). Since appellant waived his right to counsel and did not relinquish stewardship prior to the conversation with Officer Stafford, he cannot claim a *Massiah* violation.

■ Appellant concedes he dismissed appointed counsel and, following multiple psychological examinations to prove his competency, appellant was permitted to proceed *pro se* on June 5, 2000, three months before the conversation. Appellant maintains, however, he was not advised his waiver of counsel would pertain to such scenarios as presented here; the *pro se* colloquy merely warned about pretrial preparations and trial advocacy. As he would not be expected to recognize and handle Commonwealth evidence-gathering techniques as employed here, appellant contends his initial waiver of counsel should not apply in this instance. This circumstance underscores the pitfalls of *pro se* advocacy and validates this Court's strong opposition to such ill-prepared forays into legal practice.

■ The trial court was correct in finding the Commonwealth was authorized to investigate appellant's alibi fabrication scheme because it was a separate, independent crime from that for which he was currently incarcerated; appellant was attempting to tamper with a witness, 18 Pa.C.S. § 4909, offer a witness a bribe, *id.*, § 4952(a)(1)-(6), and intimidate a witness, *id.*, § 5105(a)(3)-(5). *See Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 844 (2003) (Sixth Amendment right to counsel is "offense-specific and does not attach until initiation of adversarial judicial proceedings...."); *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421, 436 (1994) (where informant's remark did not deliberately elicit incriminating statement, appellant's Sixth Amendment claim must fail). Thus, appellant's new crimes will not be shielded by any deprivation of counsel claim; he waived counsel and was attempting further criminal conduct.

580

█ Appellant alleges the Commonwealth solicited 15 different occasions of prior bad acts evidence merely to show appellant's propensity for criminal conduct. Appellant concedes that most of these references, relating to numerous bank robberies, photos with his criminal cohorts, and drug dealer "stings," would have been proper had the Commonwealth restricted its inquiries into connecting appellant to the murder weapon or if they were merely part of the natural development of *this* case. However, appellant posits that the Commonwealth used each opportunity to elaborate on his participation in some 50–60 armed robberies to sully his character in violation of Pa.R.E. 404(b).

█ Evidence is admissible if it is relevant—that is, "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110, 117–18 (2001) (internal citation omitted). Such evidence may be excluded if its probative value is outweighed by the likelihood of unfair prejudice. Pa.R.E. 403.[6] Evidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, may be admissible for some other relevant purpose. *See Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139, 1152 (2000), *cert. denied*, 532 U.S. 932, 121 S.Ct. 1381, 149 L.Ed.2d 307 (2001); *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835, 840 (1989). This Court has recognized exceptions to Rule 404, for which evidence of other crimes may be introduced, including the *res gestae* exception which allows "the complete story" to be told. *See Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 308 (2002).

**6.** We recently stated that "evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact." *Commonwealth v. Treiber*, 582 Pa. 646, 874 A.2d 26, 32 (2005) (quoting *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 350 (1998)). *Robinson* dealt with a trial that predated Rule 403. Insofar as it may be read to do so, we stress that *Treiber* does not countermand Rule 403, which remains controlling: relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice.

■ In each occurrence cited by appellant, the testimony connected appellant either to the murder weapon or demonstrated the sequence of events leading up to the murder. Additionally, upon the occasions where appellant objected to the testimony, the trial court addressed his concerns and, when appropriate, administered a cautionary instruction. Further, the court gave one final jury instruction, warning the jury not to use any prior criminal involvement as proof of his present murder charges. N.T. Trial, 8/1/01, at 4069 ("This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies, from which you might be inclined to infer guilt."). Appellant's prior bad acts argument has no merit. *See Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 111 (2004) ("jury is presumed to have followed the trial court's instructions....") (internal citation omitted).

■ During her closing, the prosecutor directed the jury to remember the testimony of appellant's cohorts who were just feet away from appellant as he fired the fatal shots. The prosecutor stated each testified that the plan for White's robbery was to be like all the others: one person would engage the victim, appellant would rob the victim and leave with the money, and they would meet up later to divide the proceeds. No victim was ever to be harmed. The prosecutor further argued that although these co-conspirators had extensive criminal backgrounds, they were nonetheless "not murderers"; as the triggerman, it was appellant who decided to break with the plan and murder White.

Appellant alleges the prosecution's characterization of his cohorts misled the jury as to their true culpability—they were murderers. Each, appellant contends, is culpable of at least second degree murder, 18 Pa.C.S. § 2502(b), as a co-conspirator or accomplice, by virtue of participation in the attempted robbery of White which resulted in his death. *See id.,* § 306 (accomplice liability); *id.,* § 903 (criminal conspiracy liability); *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa.Super.2002) (even if not principal, "[o]nce there is evidence of the

presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy.") (internal citations omitted). Appellant contends this portrayal duped the jury into assigning more credibility to appellant's cohorts than was warranted. This assertion is belied by the record.

Each testifying co-conspirator admitted his involvement in White's murder, and revealed he was serving a lengthy sentence for unrelated robberies. Although Peterson and French were not charged with any crimes relating to White's murder, each testified to this fact on direct examination. N.T. Trial, 7/20/01, at 1871; *id.*, 7/23/01, at 2297. Logan and Avila were both charged with crimes related to White's murder, and testified to the plea agreements they had with the prosecution for their participation and cooperation in appellant's trial. *Id.*, 7/25/01, at 2624–25; *id.*, 7/26/01, at 2903. In addition, appellant explored each witness's plea agreement during cross-examination. *See Commonwealth v. Rickabaugh,* 706 A.2d 826, 843 (Pa.Super.1997) ("At the outset, we note that Appellant extensively cross-examined each witness as to their potential bias and motive in testifying against him. The plea agreements were fully and fairly disclosed and the jury was able to consider the facts the witnesses may have been attempting to curry favor with the prosecution."). Therefore, appellant's claim fails.

Next, appellant argues the prosecutor improperly vouched for each testifying cohort's credibility by stating, according to their federal plea agreements, they were "required to tell the truth." *See* N.T. Trial, 7/20/01, at 1870–71 (Peterson); *id.*, 7/23/01, at 2297 (French); *id.*, 7/25/01, at 2624 (Logan); *id.*, 7/26/01, at 2903 (Avila). Appellant claims numerous Third Circuit decisions and this Court in *Commonwealth v. Tann,* 500 Pa. 593, 459 A.2d 322 (1983), have awarded new trials based upon such statements. For improper bolstering to occur, (1) the prosecutor must assure the jury the testimony of the government witness is credible, and (2) this assurance must be based on either the prosecutor's personal knowledge or other information not contained in the

record. *United States v. Walker*, 155 F.3d 180, 187 (3d Cir.1998). While both jurisdictions the Third Circuit and this Court have found, in limited circumstances and based upon additional factors, that such comments can invade the province of the jury and impermissibly bolster the credibility of a testifying witness, appellant's facts do not embody such an occasion.

In *United States v. DiLoreto*, 888 F.2d 996 (3d Cir.1989), *per se rule overruled by United States v. Zehrbach*, 47 F.3d 1252 (3d Cir.1995), the Third Circuit, applying federal constitutional law, overturned the convictions of a group of defendants because the prosecutor put the imprimatur of the federal government on the testimony of cooperating witnesses. In response to repeated credibility attacks by the defense, the prosecutor stated in his closing:

> And you also heard that they [governmental witnesses] have a plea bargain, and you heard what happened when that plea bargain is not fulfilled. If they lie, that bargain is off. That's it, no bargain. *We don't take liars. We don't put liars on the stand. We don't do that.*

*DiLoreto*, at 998 (emphasis in original). The court reasoned this mode of argument implied that the prosecution had additional facts the jury may not be privy to, "which convinced the prosecutor that his witnesses were not liars." *Id.* This perceived personal reinforcement "clearly jeopardized the defendants' right to be tried solely on the basis of the evidence presented at trial." *Id.*, at 1000.

In *Tann*, this Court awarded a defendant a new trial because the prosecutor was permitted to call to the stand a coconspirator's counsel, who testified that his client was waiving his Fifth Amendment right to remain silent so that the client could testify "truthfully." *Tann*, at 327. Counsel further detailed how the plea agreement with the Commonwealth would be nullified if his client did not testify truthfully. This Court determined counsel's testimony regarding the plea agreement, which highlighted the fact that the witness was waiving his right to remain silent, coupled with counsel's

statement that his client would "tell the truth," improperly vouched for the co-conspirator's credibility. *Id.*, at 327–28.

No such secondary or personal bolstering took place during appellant's trial. Each testifying witness, as required under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), recited the terms of his plea agreement with the government and stated it required him to "tell the truth"; all witnesses have the same obligation and swear to such an oath regardless of any prior arrangements. The mere reiteration that the federal plea bargains required truthful testimony did not improperly put the imprimatur of the government on each witness's testimony.

Further, appellant lambasted each witness on the terms of his plea agreement, and called for the jury to consider each witness's motivations for testifying against him. Appellant introduced this testimony during cross-examination, going so far as to use an overhead projector to highlight and summarize statements to attempt to impeach Logan's testimony. N.T. Trial, 7/25/01, at 2656–60. Since appellant introduced this evidence, he cannot now claim the Commonwealth impermissibly bolstered Logan's credibility by rebutting his line of questioning. *See generally Commonwealth v. Duffey*, 519 Pa. 348, 548 A.2d 1178, 1188 (1988) (where defendant "opened the door" for jury's inquiry, Commonwealth permitted fair rebuttal); *see also Walker*, at 187.

■ The prosecutor's reference to Logan's sentencing transcript during her closing argument could more plausibly be viewed as improper vouching. The prosecutor stated, "And what does the Judge say? I commend you [Logan] for that. You [Logan] still came in here and told the truth even after you [Logan] were beaten. That's the Judge in the Federal trial." N.T. Trial, 7/31/01, at 4007.

■ The Third Circuit has indicated that once defense counsel's argument is rebutted concerning the credibility of a government witness, the prosecutor's references to the witness's credibility should end. *Walker*, at 187. If a prosecutor proceeds further and starts arguing in the affirmative that the

witness is credible, *and* does so based on either information not in the record or his own knowledge, then the prosecutor has engaged in improper bolstering. *Id.*

 It is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Fletcher,* 580 Pa. 403, 861 A.2d 898, 916 (2004) (quoting *Commonwealth v. Stokes,* 576 Pa. 299, 839 A.2d 226, 230 (2003)). Like the defense, the prosecution is accorded reasonable latitude and may employ oratorical flair in arguing its version of the case to the jury. *Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316, 1322 (1995), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996) (citing *Commonwealth v. Marshall,* 534 Pa. 488, 633 A.2d 1100, 1107 (1993)). Prosecutorial misconduct will not be found where the comments were based on the evidence or derived from proper inferences. *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1377 (1991), *cert. denied,* 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991) (quoting *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 957 (1982)).

We do not read *Walker* so strictly as to prevent a prosecutor from ever mentioning the credibility of a government witness in a closing argument after rebutting that argument in the evidentiary portion of a trial. To read *Walker* that way would eliminate an inquiry into *Walker's* second requirement, that the vouching be based on either information not in the record or part of his own knowledge. Finally, reading *Walker* strictly would conflict with settled state precedent that a prosecutor has reasonable latitude in presenting a closing argument and may make comments based on the evidence or derived from proper inferences. *See Williams, supra; Chester, supra.* The prosecutor's statement here could be seen as an effort to entreat the jurors to believe Logan's testimony based on the federal judge's assessment of his credibility,

arguably constituting improper bolstering. However, the prosecutor was not personally assuring the jury that Logan's testimony was credible; she only referenced the federal judge's comments. Further, since appellant introduced the federal plea agreements into evidence, the prosecutor was not bolstering Logan's credibility based on information not in evidence. The prosecutor's brief mention of the federal judge's comments was based on the evidence and did not rise to the level of affirmative advocacy for Logan's credibility to constitute prejudice to appellant. However, this is not to say that all prosecutorial references to a government witness's credibility during closing argument are appropriate after the prosecution rebutted defense claims that the witness was not credible. In this specific instance, no prejudice occurred; therefore, this claim warrants no relief.

Appellant posits the prosecutor committed misconduct during her closing by saying: "This really isn't a case about the law, ladies and gentlemen, because if you find it's him, and he did this, it's murder one." N.T. Trial, 7/31/01, at 3991. Appellant contends a new trial is warranted because the jury could have found he did not have the requisite *mens rea* for first degree murder, and it could have convicted him of second degree murder. Appellant alleges the prosecutor misrepresented the law by attempting to channel the jury into believing that only first degree murder was available.

Here, the prosecutor presented evidence that during the robbery attempt, appellant intentionally shot White three times for White's failure to adhere to his demands. The prosecutor argued that if the jury accepted these facts, appellant was guilty of first degree murder. The closing statement requesting first degree murder did not mislead the jury, as it was based upon the evidence. Taken in context, it did not preclude the jury from rendering a true verdict. However, we strongly disapprove of advocating a case is "not about the law." Advocacy in this vein may, in some circumstances, adversely affect the adjudicatory process and potentially undermine the confidence in a verdict.

██ Appellant maintains his due process and *Brady* rights were violated when the prosecutor failed to inform the jury, or elicit from each testifying co-conspirator, that each was immune from prosecution for any charges related to White's robbery and murder; "[t]he prosecutor's lies here violate her duty to refrain from presenting testimony or information she knows to be false or misleading and that is harmful to the defendant." Appellant's Brief, at 67. Appellant contends that although no plea agreement was memorialized in writing, these "unspoken deals" meant cooperation would result in no charges being filed against a testifying co-conspirator. Declarations of each co-conspirators' counsel attached to appellant's brief attest that no subsequent charges were in fact filed.

██ The record shows that two of the four co-conspirators testified they faced charges relating to White's murder and, although the prosecution decided not to pursue additional or original charges against the other two offenders, the district attorney was the sole arbiter of this decision. *See Commonwealth v. Stipetich*, 539 Pa. 428, 652 A.2d 1294, 1295 (1995) ("It is well established that district attorneys, in their investigative and prosecutorial roles, have broad discretion over whether charges should be brought in any given case."). Appellant's suggestion that the prosecution had illicit dealings or lied is unsubstantiated; there was no *Brady* violation because the terms of each plea agreement were fully disclosed. Additionally, newly created declarations attached to an appellate brief have not been tested via the adversarial system, and are therefore not accepted for their truth. That said, nothing in these documents support appellant's argument of prosecutorial misconduct or unlawful dealings.

██ Appellant's primary trial strategy was to point the finger at Curtis French, arguing that since French had previously handled the murder weapon and was at the scene of White's murder, he could have been the triggerman. With this as a premise, appellant claims the jury should have been instructed on accomplice liability; this would have better apprised the jury as to French's true culpability, and it could

have found appellant was merely an accomplice. This argument is misdirected because French was not on trial here—appellant was, and the jury was fully aware of French's conduct in White's murder. The jury was free to decide who the actual shooter was. *See Commonwealth v. Miller*, 555 Pa. 354, 724 A.2d 895, 901 (1999). Simply because appellant sought to shift the jury's inquiry did not oblige the court to entertain his efforts.

■ Appellant claims he was not competent during his trial, nor should he be deemed competent now on appeal. Since the time appellant decided to defend himself, appellant and his court-appointed standby counsel have been waging a war for stewardship over his defense; counsel claimed appellant was incompetent to maintain his own defense, and demanded a competency hearing. Before allowing appellant to proceed *pro se*, the trial court ordered appellant to be evaluated by two psychological experts; both testified appellant was competent. It was only after being sentenced to death that appellant had a change of heart and permitted standby counsel to seek a new competency determination.

Appellant's request for funds to retain a psychological expert and a new competency hearing were denied by the trial court January 31, 2003. The court found appellant's belated request was result-driven, commenting:

[I]t is nevertheless apparent that [appellant] proffers no convincing argument or evidence to compel the Court to revisit its determination that [appellant] was competent to waive the right to counsel. Although at this hour he would attempt to impugn the independent expert reports relied upon by the trial court in its determination ... nothing suggests any deficiency in the information which the Court took into account.

Trial Court Order, 1/31/03. Following this reasoning, this Court denied this same request April 29, 2003. We see no basis to reverse this determination.

■ Appellant's next cluster of claims revolves around events which transpired at his penalty phase hearing. Initial-

ly, appellant contends the Commonwealth violated his federal and state due process rights by incorporating "other crimes" evidence from the guilt phase of his trial to the penalty phase. *See* N.T. Trial, 9/4/01, at 4190. Specifically, appellant points to testimony from his co-conspirators and police detectives wherein each described numerous robberies and parole violations appellant committed; appellant was not charged with these crimes, and he believes the jury was permitted to infer his propensity to commit criminal acts in deciding whether he had a significant history of felony convictions. 42 Pa.C.S. § 9711(d)(9).

■■■ As discussed previously, appellant's "other crimes" evidence admitted during the guilt phase of his trial was properly admitted under the *res gestae* exception to Pa.R.E. 404, or was brought in by appellant opening the door to such evidence via his inquiries during cross-examination. The Commonwealth did not err by incorporating this evidence into the penalty phase because the same jurors had already heard this testimony previously; "[a]ppellant's guilt had already been determined, and the incorporation of this evidence into the penalty stage was purely a procedural matter carried out pursuant to 42 Pa.C.S. § 9711." *Commonwealth v. Wharton,* 530 Pa. 127, 607 A.2d 710, 722 (1992) (quoting *Commonwealth v. Albrecht,* 510 Pa. 603, 511 A.2d 764, 777 (1986)). In addition, appellant had other properly admitted felony convictions for the jury to consider which satisfied 42 Pa.C.S. § 9711(d)(9). *See* Supplemental Trial Court Opinion, 8/27/03, at 15 (Commonwealth presented "three uncontested qualifying felonies involving armed robberies—of themselves more than sufficient to establish a significant history under the statute. . . ."). Appellant's claim that this "other crimes" evidence tainted a proper consideration of his documented criminal history is baseless.

■■■ Appellant claims his rights against self-incrimination and due process were violated when the prosecutor stated in her penalty phase closing statement: "Mr. Williams has expressed no remorse. You know who he is. You know him to

be cold. You know him to be a murderer." N.T. Trial, 9/4/01, at 4313. Appellant argues this comment referenced his failure to testify, in violation of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir.1991), and the Fifth Amendment of the United States Constitution.

In *Griffin*, the United States Supreme Court admonished a prosecutor for stating during his closing: "These things he has not seen fit to take the stand and deny or explain. And in the whole world, if anybody would know, this defendant would know. [Victim] is dead, she can't tell you her side of the story. The defendant won't." *Griffin*, at 611, 85 S.Ct. 1229 (internal quotations omitted). Even more constitutionally offensive, the trial court charged the jury that the defendant's refusal to rebut such inferences made such evidence "more probable." *Id.*, at 610, 85 S.Ct. 1229. The Supreme Court found these comments and jury instruction "solemnize[d] the silence of the accused" and violated the defendant's Fifth Amendment right. *Id.*, at 614, 85 S.Ct. 1229.

Relying on *Griffin*, the Third Circuit in *Lesko* ordered a new death penalty hearing because the prosecutor made an impermissible "appeal to vengeance" during his penalty phase closing, and in response to the defendant's mitigation testimony, argued the defendant failed to show remorse. The Court held "that both remarks were improper. Considered cumulatively, the errors in the prosecutor's penalty phase argument were not harmless...." *Lesko*, at 1541. Unlike *Griffin* or *Lesko*, however, the prosecutor's isolated reference in appellant's penalty phase closing was not continual or companioned with additional error, and was not directed at appellant's *silence*, but his lack of remorse. *See Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 141 (2001) ("[t]he Commonwealth may also argue at the penalty phase that a defendant showed no sympathy or remorse, so long as it is not an extensive tirade."). This mention did not constitute commentary on appellant's Fifth Amendment right to silence.

 At the penalty phase of trial, where the presumption of innocence is no longer applicable, the Commonwealth is permitted to employ oratorical flair and impassioned argument for the death sentence. *See Commonwealth v. Baker,* 531 Pa. 541, 614 A.2d 663, 671–72 (1992). Although a defendant's Fifth Amendment privilege still applies, *Estelle v. Smith,* 451 U.S. 454, 462–63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), a capital defendant's lack of remorse can be tentatively questioned. *See Rivera,* at 141; *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 39–40 (1998) (isolated remorse attack did not offend *Griffin,* and this Court "reject[ed] rationale of *Lesko[ v. Lehman]* "); *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288, 301 (1983) (single reference to capital defendant's lack of remorse is "a factor which the jury should consider."), *reversed on other grounds by Lesko v. Owens,* 881 F.2d 44 (3d Cir.1989). Here, no such tirade occurred; the prosecutor's solitary comment was in reference to appellant's brash *pro se* advocacy, which at times, bordered on improperly testifying through questioning. *See* N.T. Trial, 9/4/01, at 4210 ("I am innocent—How you supposed to feel?"); *id.,* at 4217 ("Listen. Let me ask you this, what should an innocent man admit to?"). Appellant's Fifth Amendment claim fails. *See Commonwealth v. DiNicola,* 581 Pa. 550, 866 A.2d 329, 336 (2005) (this Court "decline[d] to expand *Griffin* to preclude a fair response by the prosecutor in situations [where the defense made silence an issue].") (citations omitted).

 Appellant argues the trial court erred in failing to charge the jury that it could not find aggravating circumstance 42 Pa.C.S. § 9711(d)(6) (killing committed in perpetration of felony), unless it found appellant was the actual shooter. Since this was his version of events, appellant contends the jury could have believed he was merely an accomplice, and this aggravator would not apply to him. *See Commonwealth v. Lassiter,* 554 Pa. 586, 722 A.2d 657, 661 (1998) (accomplice does not "commit" murder, cannot be guilty of § 9711(d)(6)).

All three co-conspirators testified appellant was the triggerman, and the Commonwealth's entire case was built on this fact; appellant confessed to Peterson that he in fact shot

White. The guilt phase jury charge presented the jury with the only option the verdict allowed—appellant was guilty of first degree murder as the principal. After the jury found appellant guilty of first degree murder as the shooter, the Commonwealth properly sought the § 9711(d)(6) aggravator. In addition, although appellant can rely upon relaxed waiver to avoid waiver of this issue, *Freeman*, at 403, we would be hard pressed to fault a trial court for failing to give a jury instruction not requested by either party, and which was not consistent with any evidence presented at trial. *See Commonwealth v. Cuevas*, 574 Pa. 409, 832 A.2d 388, 393 (2003) (trial judge has duty to instruct jury only on evidence established at trial). This issue warrants no relief.

Appellant claims his initial waiver of counsel prior to trial was insufficient to carry over to the penalty phase. Appellant's contention is that his initial waiver did not apprise him of the gravity of the penalty phase, and the court should have *sua sponte* held another waiver colloquy to ensure appellant intended to continue self-representation. This position is meritless. Appellant was asked whether he wanted to continue self-representation or if he wished for standby counsel to take over prior to commencement of the penalty phase. He initially stated counsel would conduct the hearing, but later reneged and refused to permit counsel to advocate. *See* N.T. Trial, 9/4/01, at 4175. Further, appellant was repeatedly advised by the court and standby counsel what evidence was germane to the penalty phase; the fact that he chose to ignore such guidance does not entitle him to relief.

Appellant maintains the Commonwealth failed to prove, beyond a reasonable doubt, that he had a significant history of felony convictions involving the use or threat of violence. 42 Pa.C.S. § 9711(d)(9). Appellant posits that although the Commonwealth introduced into evidence his three armed robbery convictions, it failed to prove these convictions were *in fact* "felonies." It is the Commonwealth's burden to admit into evidence a defendant's prior felony convictions; the court is charged with allowing the jury to consider only those

convictions that satisfy § 9711(d)(9). A trial court is not required to instruct the jury that each element of an aggravating circumstance be proven beyond a reasonable doubt.[7] *Commonwealth v. Busanet*, 572 Pa. 535, 817 A.2d 1060, 1076 (2002). A jury instruction stating the Commonwealth must prove aggravating circumstances beyond a reasonable doubt is appropriate. *See id.*, at 1075–76. Here, the trial court advised the jury the Commonwealth must prove aggravating circumstances beyond a reasonable doubt. *See* N.T. Trial, 9/4/01, at 4325. Thus, the trial court's jury instruction was appropriate. This claim warrants no relief.

 Appellant alleges he should have been permitted to argue, as mitigating evidence, the unfairness of subjecting him to the death penalty when his equally-culpable co-conspirators received lenient treatment. Relying on *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), appellant asks this Court to broaden the range of permissible mitigating evidence to permit defendants to point out inconsistencies in the legal system and disparate treatments which might sway a juror away from imposing death. Appellant argues such incongruent treatment of similarly situated defendants should serve as mitigation, pursuant to *Lockett's* "the circumstances of the particular offense" mitigating circumstance. *Id.*, at 604, 98 S.Ct. 2954. Appellant contends *Lockett* defined mitigating criterion extremely broadly, and mitigating evidence as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* This, he believes, encompasses the allegedly disparate treatment of cohorts.

Capital phase mitigating evidence is limited to those criterion enumerated in 42 Pa.C.S. § 9711(e); a cohort's ultimate criminal punishment is not among those established by the General Assembly. The phrase "the circumstances of the particular offense" refers to mental states and surrounding

---

**7.** Notably, many aggravating circumstances are expressed in a single phrase and in fairly straightforward terms, *see* 42 Pa.C.S. § 9711(d), and, accordingly, are not readily considered in terms of component elements.

events leading up to the criminal act—not what punishment will be imposed later. This Court has routinely rejected the argument that the criminal disposition of a defendant's cohorts has any relevance in mitigation to a defendant's own punishment. *See Commonwealth v. Haag*, 522 Pa. 388, 562 A.2d 289, 298 (1989) ("the disposition of the cases against [appellant's cohorts] has no bearing upon appellant's sentence."); *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27, 33 (1989) (life sentence of co-conspirator who fired fatal shot was not mitigating circumstance to defendant's role in crime).

In *Commonwealth v. Lopez*, 578 Pa. 545, 854 A.2d 465 (2004), this Court characterized this same argument as "meritless," commenting:

There is no mitigating circumstance which provides for the type of comparison appellant suggests; even the "catch-all" mitigation circumstance [42 Pa.C.S. § 9711(e)(8)] would not encompass evidence of co-conspirators' sentences because such evidence has nothing to do with "the character and record of the defendant" or "the circumstances of his offense."

*Id.*, at 471 (citation omitted).

 Appellant's last issue is that the cumulative effect of all the alleged errors entitles him to relief. However, as this Court has repeatedly held, "no number of failed claims may collectively attain merit if they could not do so individually." *Id.* (quoting *Commonwealth v. Williams*, 532 Pa. 265, 615 A.2d 716, 722 (1992)).

Finally, having concluded appellant is not entitled to relief on any of the claims that he raises, we must also conduct the review mandated by 42 Pa.C.S. § 9711(h)(3), which requires this Court to affirm the sentence of death unless we determine:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

42 Pa.C.S. § 9711(h)(3).

 Our review of the record establishes the sentence imposed was not the product of passion, prejudice, or any other arbitrary factor. Additionally, we conclude the evidence presented was sufficient to support the jury's finding of two aggravating circumstances: (1) appellant had a history of violent felonies, *id.*, § 9711(d)(9), and (2) appellant committed the murder while in the course of a felony (robbery), *id.*, § 9711(d)(6). Accordingly, we affirm the verdict and the sentence of death.

Appellant's judgment of sentence is affirmed.[8]

Justice CASTILLE, Justice NEWMAN, Justice SAYLOR and Justice BALDWIN join the opinion.

Chief Justice CAPPY files a concurring opinion.

Justice BAER files a dissenting opinion.

Chief Justice CAPPY, concurring.

I join the majority opinion, except for its analysis of the claim that Appellant brought under the Interstate Agreement on Detainers Act ("IADA" or "Act"), 42 Pa.C.S. § 9101. I write separately to set forth my reasoning for affirming the trial court's decision to deny Appellant relief under the IADA. More specifically, I believe that the trial court correctly determined that because Appellant did not demonstrate that he strictly complied with the IADA's procedural requirements, its 180–day time limit for bringing him to trial did not commence, and the Act was not violated.[1,2]

---

**8.** The Prothonotary is directed to transmit the complete record of this case to the Governor, pursuant to 42 Pa.C.S. § 9711(i).

**1.** In this regard, I disagree with the majority and Mr. Justice Baer in his dissenting opinion that the trial court addressed and resolved the substance of Appellant's IADA claim. In my view, the trial court's decision that Appellant was brought to trial in a timely fashion was rendered only under Pennsylvania's prompt trial provision at Pa. R.Crim.P. 600 (formerly Pa.R.Crim.P. 1100).

By way of background, the IADA is a congressionally sanctioned interstate compact within the Compact Clause of the United States Constitution, U.S. Const. Art. I, § 10, cl. 3, and therefore, is a federal law, subject to federal construction. *Cuyler v. Adams*, 449 U.S. 433, 438–442, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981). Under principles of federal construction, the sources that the courts consult to determine the Act's meaning are its language and structure as well as its legislative history, which is reflected in the comments made on the draft Agreement by the Council of State Governments at its 1956 conference and by Congress when it adopted the Act in 1970. *See, e.g., Carchman v. Nash*, 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985). Further, the courts keep the purposes of the Act and the reasons for its adoption in mind when construing its provisions. *See, e.g., United States v. Mauro*, 436 U.S. 340, 361–62, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).[3]

The Act establishes procedures by which one state (the "Receiving state") obtains temporary custody from another state of a prisoner (the "Sending state") against whom a detainer was lodged in order to bring him to trial on a pending indictment, information, or complaint. Art. II; *Cuyler*, 449 U.S. at 436 & n. 1, 101 S.Ct. 703. Under the Act, there are alternative procedures for the transfer of custody of such a prisoner. One of these procedures, found in Article III, is initiated by the prisoner.[4]

2. I note that in connection with Appellant's IADA claim, the trial court also stated that Appellant was not seeking relief under the IADA, and that the parties had agreed that Appellant's rights to a speedy trial would be considered under the standards set forth in Pa.R.Crim.P. 1100. These statements are not supported by the record. The record reveals no such agreement and shows that Appellant raised, and argued, and never abandoned his IADA claim.

3. The majority appears to believe that analysis of Appellant's claim under Pa.R.C.P. 600 suffices as analysis of his IADA claim. In light of these principles, I disagree.

4. The other procedure is found in Article IV and is initiated by a prosecuting officer in the Receiving state. Even though it was Appellant who purported to invoke the Act under Article III, the majority appears to be under the mistaken impression that this is an Article IV case.

In this regard, Article III(a) sets forth certain actions for a prisoner to complete in order to invoke the Act's protection. Article III(a) provides:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, *he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: ... The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.*

Art. III(a) (emphasis added). In addition, under Article III, "[i]f trial is not had on any indictment, information, or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information, or complaint shall not have any further force or effect and the court shall enter an order dismissing the same with prejudice." Art. III(d).

The courts, both state and lower federal, have addressed what steps a prisoner must take in order to trigger Article III's 180–day time period. Many of these courts have held that the period is not triggered unless a prisoner strictly complies with Article III's procedural requirements and has caused to be delivered to the prosecutor and the appropriate court the materials and information that it sets forth. *See supra*, p. 3.[5] Further, it is the prisoner's burden to prove such

---

5. *See e.g., United States v. Dent,* 149 F.3d 180 (3d Cir.1998) (concluding that prisoner's letter to District Court was insufficient to trigger Article

compliance. *See United States v. Moline,* 833 F.2d 190, 192 (9th Cir.1987); *United States v. Henson,* 945 F.2d 430, 434 (1st Cir.1991).

In considering the merits of the strict compliance approach, I find decisions of the United States Supreme Court in the area instructive. For example, in *Fex v. Michigan,* 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993), the High Court was called upon to construe the meaning of the phrase in Article III "within 180 days after [the prisoner] shall have caused to be delivered" in order to determine when the 180–day time period commences to run. Declining to construe the phrase more liberally than the literal words of the IADA would have allowed, the Court rejected that the phrase refers to the time at which a prisoner transmits his written notice of imprisonment and request for final disposition to the correctional authorities in the state where he is incarcerated. *Id.* at 47, 113 S.Ct. 1085. Rather, the Court focused on the literal language of the Act, and held that "the 180–day time period in Article III(a) of the [IADA] does not commence until the prisoner's [notice and] request for final disposition of the charges against him ha[ve] actually been delivered to the court and prosecuting officer that lodged the detainer against him." *Id.* at 52, 113 S.Ct. 1085. In doing so, the Court counseled that any arguments for a contrary result based on "fairness" and the Act's "higher purpose" were more appropriately addressed to the legislatures of the contracting states that had

III when it did not include term of commitment, the time already served, the time remaining to be served on his sentence, or any information concerning good-time credits or parole eligibility); *Norton v. Parke,* 892 F.2d 476 (6th Cir.1989) (concluding that prisoner's request that referred to Article III without the certificate of custodial authority and information regarding prisons and eligibility for parole was insufficient); *Commonwealth v. Copson,* 444 Mass. 609, 830 N.E.2d 193 (2005) (and cases cited therein) (concluding that prisoner's motion for a speedy trial, which did not include written notice of place of imprisonment, a proper request for final disposition and a certificate of inmate status and other mandated items of information, did not commence the running of the 180–day time period); *State v. Somerlot,* 209 W.Va. 125, 544 S.E.2d 52 (2000) (and cases cited therein) (concluding that Article III's 180–day time period was never triggered because prisoner failed to carry his burden of making sure that his request for final disposition was actually delivered to the court).

adopted the IADA's text. *Id.; See also Carchman,* 473 U.S. at 716, 105 S.Ct. 3401 (considering the plain language in the IADA to be of paramount significance and refusing to find that the broader purposes of the Act compelled a different conclusion, it is held that an outstanding probation-violation is not an "untried indictment, information or complaint" within the meaning of Article III).

In light of this guidance, I too conclude that under the IADA, a prisoner must demonstrate that he met all of the procedural requirements that Article III imposes upon him in order for the Act's 180–day time period to be triggered. This adheres to the text of Article III, which is cast in absolute terms, and follows the Supreme Court's jurisprudence, which hews to the IADA's literal language in construing the Act's provisions. *Fex; Carchman, supra.* at pp. 4–5; *See Alabama v. Bozeman,* 533 U.S. 146, 153, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) (viewing the word "shall" in Article IV(e) as the language of command and concluding that there is no implicit exception for a *de minimis* violation of its terms). Moreover, requiring a prisoner to follow the procedural steps that Article III sets forth advances the Act's stated purpose "to encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." Art. I.[6]

**6.** I also conclude that in light of the Act's language and legislative history and relevant case law, there is no room for Mr. Justice Baer's determination that Article III's time period was triggered in this case because neither the trial court nor the Commonwealth asserts that "the notice" that Appellant gave regarding his desire to proceed under the IADA "failed in any way relevant to its purpose of notifying the Commonwealth of [his] desire to return to Pennsylvania to defend his outstanding charges." (Dissenting Opinion, Baer, J. at 586 Pa. 609, 896 A.2d at 557). Further, I believe that Mr. Justice Baer's determination that Article III's start date was February 18, 1999, when the Commonwealth "acknowledged (and corroborated by its conduct) its receipt of Appellant's IADA notice" is inconsistent with the Supreme Court's decision in *Fex. Id.* at 613, 896 A.2d at 559.

Because I conclude that Article III's time limit did not commence to run in the first instance, I do not consider the meaning of the IADA's tolling provision in Article VI, as has Mr. Justice Baer in his dissent.

My review of the record reveals that Appellant did not show when, if ever, he caused to be delivered to the prosecuting officer and the Court of Common Pleas of Lehigh County the written notice of the place of his imprisonment, request for a final disposition of the charges brought against him, or the certificate that Article III requires. Therefore, I conclude that Appellant failed to meet his burden of proving compliance with Article III's procedural requirements; that Article III's 180–day time limit was not triggered; and that the Act was not violated in the present case.[7]

Justice BAER, dissenting.

Although the law often provides room for the courts to forgive procedural missteps, in some cases it affirmatively denies such discretion. The Interstate Agreement on Detainers Act (IADA or Act),[1] which requires dismissal with prejudice of any charges untimely tried, falls into the latter category. In my view, by conflating its analysis of the Act with the analysis of Pennsylvania's similar but distinct "Prompt Trial" rule,[2] which lacks the IADA's more demanding requirements and its mandatory sanction, the trial court erred in declining to dismiss with prejudice the charges against Appellant, James T. Williams. The Majority, affirming on a similar basis, compounds the trial court's error by enshrining it as the law of this Commonwealth. This ruling, I fear, disserves the legislative intent underlying the long-lived and well-settled

7. There is a memorandum that Appellant filed in the trial court in July 2001 entitled "Exigent Appeal" and directed to this Court's attention. The trial court viewed the memorandum to be an interlocutory appeal that was improperly submitted to it and forwarded the document to this Court for purposes of the present appeal. Attached to the memorandum are copies of documents that appear to be IADA forms. Because Appellant submitted these documents for the first time on appeal, I have not considered them nor should this Court consider them. *See* Pa.R.A.P.1921; *Commonwealth v. Young*, 456 Pa. 102, 317 A.2d 258, 264 (1974).

1. 42 Pa.C.S. § 9101.

2. *See* Pa.R.Crim.P. 600 (formerly Pa.R.Crim.P. 1100; renumbered effective April 1, 2001). In the following opinion, I refer solely to Rule 1100, which applies to this case. The Rules, in any event, do not differ in any way material to the following analysis.

statutory scheme; creates considerable tension between Pennsylvania law and binding federal law on the same question; and overrules or materially abrogates prior decisions of this Court *sub silentio.* The only remedy called for under the IADA is dismissal. Such statutes are only as effective as courts' willingness to apply them resolutely in even the most unappealing of circumstances, and it is not for the courts to tailor the import of the law to suit its result. Thus, I respectfully dissent.

Before addressing the legal concerns animating my dissent, however, it is necessary to visit the procedural history of this case. On October 18, 1996, the Commonwealth filed a written complaint in the Court of Common Pleas of Lehigh County charging Appellant with criminal homicide, robbery, and criminal conspiracy. As of October 21, 1996, however, Appellant was in the custody of federal authorities pending disposition of federal charges associated with a bank robbery unrelated to the Pennsylvania charges. Upon conviction in federal court, Appellant was transferred to a federal correctional facility in Schuylkill, Pennsylvania. Following various preliminary matters, Appellant appeared, by leave of a United States Attorney, for his preliminary hearing on the charges pending in Pennsylvania. There, he waived arraignment and pleaded not guilty to all charges.

In January 1997, Appellant was sentenced by the federal court to approximately fifty-seven years in prison. He then was remitted to the federal prison at Lewisburg, Pennsylvania. The court of common pleas, meanwhile, listed a hearing and a pre-trial conference concerning Appellant's Pennsylvania charges, and set a trial date of September 8, 1997. In March of 1997, however, the federal Bureau of Prisons determined that Appellant should serve his federal sentence at its facility in Florence Colorado (USP Florence); Appellant arrived at USP Florence on March 5, 1997. On June 6, 1997, Lehigh County lodged a detainer against Appellant, signaling Pennsylvania's intent to try Appellant on his outstanding charges.

Appellant, however, also faced unrelated homicide charges in New Jersey, which took precedence over the Pennsylvania charges. Federal authorities transported Appellant to New Jersey for trial on July 15, 1997. Following trial in New Jersey, Appellant returned to federal custody, arriving at USP Florence on February 4, 1999.

Almost immediately upon his return to Florence, Appellant prepared a petition under Article III of the IADA seeking disposition of the charges in Pennsylvania that were the subject of the Lehigh County detainer.[3] The Commonwealth received Appellant's IADA Article III petition no later than February 18, 1999. On that date, a Lehigh County law enforcement officer testified, he consulted with an IADA coordinator to address Appellant's request.

In the months that followed, the Commonwealth's efforts to secure Appellant's presence for trial met only confusion and resistance. The principal disputes appear to have revolved around whether, where the prosecution is seeking the death penalty, the IADA provides the proper mechanism for transfer between jurisdictions. Questions over whether proper procedure required some variety of "executive writ" or agreement, a writ of *habeas corpus ad prosequendum*, or a simple request under the IADA crowded out that Appellant had invoked the IADA and that a 180–day clock was ticking.[4]

3. Article III of the IADA provides, in relevant part:

 (a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint. Provided, That for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

 42 Pa.C.S. § 9101.

4. The trial court fully explicates the improbable difficulties encountered in seeking Appellant's transfer to Pennsylvania for trial. Tr. Ct. Slip

On August 13, 1999, while Lehigh County continued to pursue Appellant's transfer from federal custody for trial, the court of common pleas entered an order scheduling trial for September 27, 1999. On September 2, 1999, Appellant filed a motion seeking to continue the trial. On September 15, 1999, Appellant filed a motion to dismiss, the gravamen of which was his assertion that the Commonwealth had violated his right to a speedy trial. In September 1999, Appellant remained in federal custody. He did not arrive in Lehigh County until October 4, 1999.

On October 14, 1999, the trial court convened a hearing regarding Appellant's pre-trial motions. This hearing was followed by additional hearings in November 1999, and in February 2000. In February 2000, Appellant notified the court that he wished to waive his right to counsel and proceed *pro se.* On June 5, 2000, following an April 2000 hearing, Appellant's request was granted. On the same date, the trial court also granted Appellant's request for further hearing on his motion to dismiss. Hearings were scheduled and rescheduled, and on two separate occasions in October hearings were convened for Appellant to present witness testimony in support of his motion. On November 29, 2000, while Appellant's motion to dismiss was still pending, Appellant, in response to court order, filed a letter brief arguing that the IADA required dismissal. On December 1, 2000, the trial court conducted a final hearing. On March 26, 2001, with Appellant's arguments under Pa.R.Crim.P. 1100 ("Prompt Trial") and the IADA before it, the trial court denied Appellant's motion. Although the dispositive order referred only to Rule 1100, the trial court addressed and ultimately rejected Appellant's IADA arguments. It is the trial court's erroneous treatment of these arguments, and the Majority's quiet ratification of the trial court's reasoning, that compels me to write.

The IADA is

a compact entered into by 48 States, the United States, and the District of Columbia to establish procedures for resolu-

Op., 3/26/01, at 8–14. While I presume good faith on the part of all involved parties, that does not alter the legal impact of the delay.

tion of one State's outstanding charges against a prisoner of another State. As a congressionally sanctioned interstate compact within the Compact Clause of the United States Constitution, Art. I, § 10, cl. 3, the [IADA] is a federal law subject to federal construction.

A State seeking to bring charges against a prisoner in another State's custody begins the process by filing a detainer, which is a request by the State's criminal justice agency that the institution in which the prisoner is housed hold the prisoner for the agency or notify the agency when release is imminent. After a detainer has been lodged against him, a prisoner may file a "request for a final disposition to be made of the indictment, information, or complaint." Art. III(a). Upon such a request, the prisoner "shall be brought to trial within one hundred eighty days," provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. * * * If a defendant is not brought to trial within the applicable statutory period, the [IADA] requires that the indictment be dismissed with prejudice. Art. V(c).

*New York v. Hill*, 528 U.S. 110, 111–12, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000) (some citations and internal quotation marks omitted); *see Commonwealth v. Fisher*, 451 Pa. 102, 301 A.2d 605 (1973); *see also Cuyler v. Adams*, 449 U.S. 433, 442, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981) (holding that the IADA presents a question of federal law under the Compact Clause). Article IX of the IADA requires that the Act be "liberally construed so as to effectuate its purpose." "[A] primary purpose of the Agreement is to protect prisoners against whom detainers are outstanding." *Cuyler*, 449 U.S. at 448–49, 101 S.Ct. 703.

[A] prisoner who has a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more,

when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing.

*Id.* at 449, 101 S.Ct. 703 (quoting H.R.Rep. No. 91–1018, p. 3 (1970); S.Rep. No. 91–1356, p. 3 (1970); U.S.Code Cong. & Admin. News 1970, p. 4866); *see also United States ex rel. Esola v. Groomes,* 520 F.2d 830, 836–37 (3d Cir.1975) ("The purpose of the provision . . . is to minimize the adverse impact of a foreign prosecution on rehabilitative programs of the confining jurisdiction. \* \* \* \* [T]he psychological strain resulting from uncertainty about any future sentence decreases an inmate's desire to take advantage of institutional opportunities."). This Court has noted the same concern for "prisoners' uncertainty resulting from unresolved charges pending in another jurisdiction." *Commonwealth v. Montione,* 554 Pa. 121, 720 A.2d 738, 740 (1998) (citing *United States v. Scheer,* 729 F.2d 164 (2d Cir.1984)); *see id.* at 740 n. 1 (citing *United States v. Mauro,* 436 U.S. 340, 361, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978)) ("[E]fforts at rehabilitation are thwarted due to the anxiety and apprehension a prisoner experiences when faced with outstanding charges in another jurisdiction."); *Fisher,* 301 A.2d at 607.

Article III of the IADA permits a prisoner to seek a temporary transfer to the jurisdiction that has filed a detainer for final disposition of outstanding charges in the transferee jurisdiction. A prisoner utilizing Article III must transmit his request to the prosecutor and the court in the detaining jurisdiction. *See* IADA Art. III(a). Receipt of these materials triggers the running of a 180–day clock that counts down the period during which the prosecution must commence its case. *See Fisher,* 451 Pa. 102, 301 A.2d 605. As noted in IADA Article V, absent limited exceptions discussed below, failure to bring the case to court within the prescribed time period requires dismissal with prejudice of the charges at issue. *Id.*

The IADA explicitly permits a court to toll the clock and specifies the means at the parties' and the courts' disposal to seek such a remedy. Specifically, the statute envisages a trial court's grant of a continuance "for good cause shown in open court, the prisoner or his counsel being present." IADA Art. III(a). This language has been held by federal courts—and by this Court in *Fisher*, discussed *infra*—to mean exactly what it says, granting no quarter from the requirement that a continuance be affirmatively sought in open court during the IADA's prescribed time limitations. *See Birdwell v. Skeen*, 983 F.2d 1332 (5th Cir.1993); *Stroble v. Anderson*, 587 F.2d 830 (6th Cir.1978), *cert. denied sub nom Anderson v. Stroble*, 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Fisher*, 451 Pa. 102, 301 A.2d 605 (dismissing the charges notwithstanding that the prosecution sought a continuance on day 181). Thus, this determination of "good cause shown" cannot occur *post hoc*. When the prosecution fails to seek a continuance in compliance with IADA Article III within the 180–day time period triggered by the prisoner's request for final disposition, the law requires without qualification that we apply the statutory sanction. *See Fisher*, 451 Pa. 102, 301 A.2d 605. Indeed, courts time and again have rejected even proposed *de minimis* exceptions to the Act's clear requirements. *See Alabama v. Bozeman*, 533 U.S. 146, 153–54, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) (explicitly rejecting, under IADA Article IV, the possibility of a *de minimis* exception where little or no prejudice befalls the prisoner based upon the IADA violation); *Birdwell*, 983 F.2d at 1339–40; *Fisher*, 451 Pa. 102, 301 A.2d 605.

Even if federal law were not sufficiently instructive, our own caselaw demonstrates the flaw in any analysis that upholds Appellant's conviction and sentence in the instant case. In *Commonwealth v. Fisher*, 451 Pa. 102, 301 A.2d 605 (1973), this Court held that dismissal with prejudice of all charges was the mandatory statutory remedy for the prosecution's failure to bring prisoner to trial within the 180 days prescribed by IADA Article III(a). Upon receiving notice of five Pennsylvania detainers, while imprisoned in New Jersey, prisoner

advised Commonwealth officials that he sought disposition of the outstanding charges in Pennsylvania under the IADA. *Id.* at 606. Notice was received on June 11, 1970. *Id.* Thus, the IADA time limit began to run on that date. *Id.* Although the prosecution wrote New Jersey authorities seeking to accept custody of prisoner on August 11, 1970, he was not actually remitted to Pennsylvania custody until September 28, 1970. *Id.* In October, prisoner received a preliminary hearing, and the criminal matter was bound over for a grand jury proceeding. *Id.* On December 9, 1970, 181 days after Pennsylvania officials received prisoner's IADA request for disposition of his charges, the prosecution sought a continuance until January 1971. *Id.* On December 11, prisoner filed a *habeas corpus* petition arguing that he was entitled to discharge because the Commonwealth failed to try him within the 180 days allowed by the IADA. *Id.* The trial court denied relief.

On appeal, this Court explicitly rejected the Commonwealth's argument that scheduling conflicts precluded its bringing defendant to trial within the prescribed time limit. *Id.* at 607. Further, we rejected the prosecution's reliance on a New Jersey case that permitted "the grant of any necessary or reasonable continuance at any time prior to an actual entry of an order dismissing the indictment." *Id.* (citing *State v. Lippolis*, 55 N.J. 354, 262 A.2d 203 (1970)). "In so doing," we held, "the court freighted the statute with considerations of prejudice and the lack thereof, emanations of which we fail to perceive and accordingly refuse to adopt." *Id.* "We read this enactment to provide that the action of continuing the matter *must be determined at or prior to the expiration of the one hundred and eighty (180) day period prescribed in the statute.*" *Id.* (citing *Commonwealth v. Martin*, 445 Pa. 49, 282 A.2d 241 (1971)) (emphasis added). Regarding the Commonwealth's arguments that the necessity of securing a particular witness and the burden of preparing a companion case against defendant precluded timely trial, *id.* at 607 n. 5, we observed that, "[w]hile the Commonwealth might arguably have had good cause to obtain a continuance, it does not have, nor did it attempt to offer, an excuse for its dilatoriness in seeking the

continuance." *Id.* at 607. We held that this fact, coupled to the mandatory nature of the IADA, compelled dismissal with prejudice of the outstanding charges.

Our decision in *Fisher*, moreover, followed earlier decisions of this Court under the IADA's predecessor statute. In *Commonwealth v. Bell*, 442 Pa. 566, 276 A.2d 834 (1971), we ruled that not only did the prosecution's failure to bring defendant to trial within 180 days mandate dismissal, but that dismissal, under the terms of the then applicable statute, was self-executing and entirely divested the court of jurisdiction. *Id.* at 837–38. Accordingly, all motion practice that followed that expiration, whether initiated by defense or prosecution, was without consequence.[5] *Id.* at 838. "The clear language of both statute and our unanimous opinion in [*Commonwealth v. Klimek*, 416 Pa. 434, 206 A.2d 381 (1965)] compel[led]" dismissal of the indictment. *Id.* In *Klimek*, as well, we required dismissal where the 180–day period expired without a court-ordered continuance or defendant's agreement to postponement of his trial. "Since the statute was not complied with, the court lost jurisdiction to try the indictments and, under the clear mandate of the statute, the indictments must be dismissed." *Klimek*, 206 A.2d at 382.

**5.** The statute then in effect, Act of June 28, 1957, P.L. 428, 19 P.S. § 881, *et seq.*, did not materially diverge at § 1(a) from Article III(a) of the current IADA, both setting forth nearly verbatim the same procedure under which a prisoner may request final disposition of outstanding detainers, and providing that, upon receipt of such request, the Commonwealth has 180 days to bring defendant to trial. *See Bell*, 276 A.2d at 835 n. 3. Its remedy, however, was more strongly worded then than the present IADA's remedy. Section 2 of the former act provided that, where trial is not commenced within the time provided, "no court of this state shall any longer have jurisdiction thereof, nor shall the untried indictment be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." *See Bell*, 276 A.2d at 835 n. 2. That said, the only distinguishing detail is the jurisdictional language of the former statute, absent from the instant statute. *See* IADA Art. V(c). A prisoner's entitlement to relief under the current IADA is no longer jurisdictional or self-executing. *See Hill*, 528 U.S. at 117, 120 S.Ct. 659 (holding that IADA protections may be waived). Even so, in the absence of waiver the language of Article V clearly requires dismissal, and in terms no less mandatory than Pennsylvania's predecessor statute.

In the case at bar, the trial court, in a footnote, stated that "the IAD was not violated here." Although a Pennsylvania official had a copy of Appellant's IADA request on February 17, 1999, it contended, Appellant failed to demonstrate

> that he complied strictly with the requirements of the IAD to invoke the 180 day time limit, see *U.S. v. Dent*, 149 F.3d 180 (3d Cir.1998); *Commonwealth v. Lloyd*, 370 Pa.Super. 65, 535 A.2d 1152 (1988), and is not seeking relief pursuant to the IAD. As further discussed *infra*, Pennsylvania's IAD coordinator never requested custody of Defendant.

Tr. Ct. Op., 3/26/01, at 6 n. 5. These cases, however are distinguishable. *Dent*, for example, was not decided under the IADA. Furthermore, the defendant in *Dent* had delayed his trial through affirmative conduct (flight) entirely absent from the instant case. In *Lloyd*, the defendant filed his IADA request before he was actually incarcerated, a predicate condition for the Act's application. Here, again, this circumstance in no way informs the instant case.

Neither the trial court nor the Commonwealth asserts that notice failed in any way relevant to its purpose of notifying the Commonwealth of Appellant's desire to return to Pennsylvania to defend his outstanding criminal charges. Indeed, the Commonwealth testified that upon receiving Appellant's Article III notice a Lehigh County law enforcement officer called an IADA administrator to address the situation.[6] Finally, prior

6. Mr. Chief Justice Cappy, in his Concurring Opinion, relies upon the United States Court of Appeals for the Third Circuit's decision in *Dent*, the United States Supreme Court's decision in *Fex v. Michigan*, 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993), and other precedents to require Appellant's "strict compliance" with the activating conditions of IADA Article III and assign him the burden of demonstrating such compliance. Op. at 597–98, 896 A.2d 549–50. This reading fails to acknowledge, however, the *Dent* court's recognition that in the Third Circuit less than "strict compliance" may be sufficient under certain circumstances. *See Dent*, 149 F.3d at 186–87. In *Casper v. Ryan*, 822 F.2d 1283 (3d Cir.1987), the court noted that "[s]trict compliance with Article III may not be required when the prisoner has done everything possible and it is the custodial state that is responsible for the default." *Id.* at 1293. Rather, in *Casper*, the court aimed simply to ensure that an ambiguous or incomplete notice would not "create a trap for unwary

to final disposition of Appellant's motion to dismiss, Appellant filed on November 29, 2000, a lengthy letter brief invoking the IADA and accurately characterizing how it applied in this case. Thus, the trial court's subsequent claim that Appellant did not seek the Act's protection is at best specious.[7]

prosecuting officials," thus undermining "Article III's systematic method of rapidly adjudicating charges against prisoners held in another jurisdiction." *Id.* at 1293 (internal quotation marks omitted). Critically, the United States Supreme Court itself has noted the adequacy of substantial compliance where the prosecution is on notice of a prisoner's invocation of the Act. *See United States v. Mauro*, 436 U.S. 340, 364–65, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978) (holding that prisoner's requests for a speedy trial, notwithstanding his failure specifically to invoke the IADA in those requests, were "sufficient to put the Government and the District Court on notice of the substance of his claim"); *see also Fex*, 507 U.S. at 49–50, 113 S.Ct. 1085 (triggering the IADA clock upon the prosecution's receipt of a prisoner's request rather than upon the prisoner's transmittal, in part to ensure "that the receiving State's prosecutors are in no risk of losing their case until they have been *informed* of the request for trial"). Given the Supreme Court's primacy in interpreting the IADA, any more strict reading cannot stand.

Even if *Mauro were not conclusive against the imposition of strict compliance against Appellant,* w e are not presented with a case like *Dent.* In that case, the court ruled against the prisoner in part because his communications to prosecutors failed expressly to invoke the IADA. In this case, however, it is undisputed that the prosecutor recognized the gravamen of Appellant's request in the first instance. Indeed, as discussed at greater length *infra,* within days of its undisputed receipt of Appellant's request for disposition under the IADA Article III, the prosecution contacted Pennsylvania's IADA coordinator, an act as unequivocal in its connotation as the IADA is in its consequence. To require uniformly strict compliance is inconsistent with binding interpretations of the Act and manifestly contradicts the Act's Article IX admonition that we must construe the Act liberally "to effectuate its purposes," one of which the Supreme Court has identified as the "protect[ion] of prisoners against whom detainers are outstanding." *Cuyler,* 449 U.S. at 448–49, 101 S.Ct. 703. Where, as here, the prosecution by its conduct manifests clear awareness of the invocation and applicability of the IADA, I would not punish the prisoner where the subsequent delay and failure to request a continuance under the Act falls squarely on the shoulders of authorities, over whom a prisoner necessarily has no control.

7. In its opinion in support of its ruling rejecting Appellant's motion to dismiss, the trial court claims that "Both parties agree the applicable standard in this case is Pa. R.Crim. P. No. 1100." Tr. Ct. Op., 3/26/01, at 5 n. 6. This assertion is highly problematic in light of Appellant's November 29, 2000 filing addressing itself solely to the claim that the IADA required dismissal of Appellant's conviction.

Similarly, the Commonwealth argues that Appellant was not in fact transferred to the Commonwealth under the IADA. The Commonwealth notes that in finally arranging to transfer Appellant to Pennsylvania custody, the mechanism adopted involved the withdrawal of the detainer and the issuance of an executive writ, or writ of *habeas corpus ad prosequendum*. This argument also is unavailing. Upon invocation, the IADA governs all subsequent proceedings pertaining to the underlying indictments or informations. *See Mauro*, 436 U.S. at 363, 98 S.Ct. 1834 ("Once the Federal Government lodges a detainer against a prisoner with state prison officials, the Agreement by its express terms becomes applicable and the United States must comply with its provisions."); *see also United States v. Schrum*, 638 F.2d 214 (10th Cir.1981) (form of writ inconsequential to IADA's application); *accord United States v. Williams*, 615 F.2d 585, 590 (3d Cir.1980); *United States v. Palmer*, 574 F.2d 164 (3d Cir.1978). Neither the prosecution

Nor does waiver for want of preservation apply in this case. Although the Act's protections are waivable, *see Hill*, 528 U.S. at 117, 120 S.Ct. 659 (quoting *United States v. Mezzanatto*, 513 U.S. 196, 206, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995)) (finding that "the IAD 'contemplate[s] a degree of party control that is consonant with the background presumption of waivability'" (modification in original)), Appellant raised at every stage of this litigation his contention that the Act had been violated. In November 2000, in response to a court order dated October 25, 2000, Appellant extensively argued, *pro se*, that the prosecution had violated the time limit established in IADA Article III, and that the appropriate remedy was dismissal. The trial court, in its opinion denying Appellant's motion to dismiss, addressed the merits of the IADA argument at some length. Before this Court, as well, Appellant properly raises the issue. Brief for Appellant at 95–98; *see Mauro*, 436 U.S. at 364–65, 98 S.Ct. 1834 (Prisoner "persistently requested that he be given a speedy trial. After his trial date had been continued for the third time, he sought the dismissal of his indictment. . . . We deem these actions . . . sufficient to put the Government and the District Court on notice of the substance of his claim."). By frequently invoking the Act's protections, Appellant put the prosecution and the trial court on notice that the Act's severe sanctions were in the offing. Especially insofar as the "relaxed waiver" doctrine applies to this capital case, a fact acknowledged by the Majority, *see* Maj. Op. at 574–75, 896 A.2d at 535–36 (noting that the abolition of "relaxed waiver" effected by *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), applies only to cases not yet pending at the time of *Freeman's* filing), there is simply no basis on which to conclude that Appellant has failed to bring the IADA violation squarely before this Court and the court below.

nor the Majority disputes Appellant's initial invocation of IADA Article III. Once a prisoner or prosecuting authority initially has triggered the IADA by filing a detainer, any alternative writ simply constitutes a "written request for temporary custody" under the IADA. *Mauro*, 436 U.S. at 361, 98 S.Ct. 1834. "Any other reading" of the IADA's time constraints "would allow the Government to gain the advantages of lodging a detainer against a prisoner without assuming the responsibilities that the Agreement intended to arise from such an action." *Id.* at 364, 98 S.Ct. 1834 (footnotes omitted); *cf. Scheer*, 729 F.2d at 170–71 (ruling in favor of the prosecution based on waiver, but declining to agree with the proposed rationale that the writ of *habeas corpus ad prosequendum* took the case outside the IADA). The prerogative to invoke IADA Article III lies with the prisoner, whose interests in the timely disposition of outstanding charges it endeavors to protect.

Considering its conviction that the IADA was neither properly invoked nor otherwise applicable in this case, the trial court nevertheless spent a great deal of time arguing that it does not require dismissal even if it applies. The trial court appears largely to rely on the intractable morass encountered, during the spring and summer of 1999, when Pennsylvania officials attempted to secure Appellant's presence to try his outstanding charges per his February 1999 demand. The trial court's detailed recital of the many communications that passed between Commonwealth and federal authorities amply demonstrates the confusion that infected the process. It does not, however, explain how the IADA permits even diligent prosecutors acting in good faith to deny Appellant's clearly invoked right to a timely trial because officials in various jurisdictions fail to understand or abide the law governing the use of detainers. *See Mauro*, 436 U.S. at 364, 98 S.Ct. 1834.

The trial court sets forth dates that require dismissal notwithstanding any degree of prosecutorial diligence and federal obstruction. The trial court recognizes that Appellant's availability under the IADA commenced upon his return to USP Florence from New Jersey on February 4, 1999. In August

1999, trial was scheduled for mid-September. On September 2, 1999, Appellant sought a continuance to prepare his defense. Two hundred and ten days separate February 4, 1999, from September 2, 1999. If we identify as the start date February 18, 1999, when the Commonwealth acknowledged (and corroborated by conduct) its receipt of Appellant's IADA notice, the relevant span shrinks to 196 days; the one hundred eightieth day after February 18, 1999, fell on August 16, 1999.[8] The trial court, however, ruled that the period between February 4 and September 2, 1999, constituted excludable time due to the Commonwealth's diligence in pursuing Appellant's presence in Pennsylvania. Thereafter, it ruled, Appellant's various motions caused all delays, thus the delays constituted excludable time. In support of this ruling, the trial court relied on an analogy to Pa.R.Crim.P. 1100, Pennsylvania's "Prompt Trial" provision, which, in the absence of the IADA's mandatory language requiring a specific sanction, affords courts some latitude to forgive delays after the running of the relevant time limit.

The Majority, summarily acknowledging the gravamen of Appellant's argument, impugns his failure to recognize that "a trial court has the discretion to extend the deadline or exclude days 'for good cause shown.'" Maj. Op. at 586 Pa. 575, 896 A.2d at 536 (citing *Commonwealth v. Montione*, 554 Pa. 121, 720 A.2d 738, 740 (1998)). The Majority, however, fails to acknowledge that "good cause shown" under the IADA refers specifically to a showing in open court, the defense being present, of the necessity and reasonableness of a duly sought continuance prior to the expiration of the applicable IADA time limit. *See Fisher*, 451 Pa. 102, 301 A.2d 605; *see also Birdwell*, 983 F.2d 1332; *Stroble*, 587 F.2d 830.

The Majority's citation to *Montione*, however, is unavailing. In its parenthetical, the Majority summarizes *Montione* as follows: "IAD 'tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court....'" Maj. Op. at 586 Pa. 575, 896 A.2d at 536–37. Article VI(a) of the

8. August 15, 1999, the actual one hundred eightieth day, fell on a Sunday.

IADA addresses a prisoner's ability to stand trial. It provides that "the running of [the time period prescribed in Article III] shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." In *Montione*, this Court addressed the import of Article VI as a matter of first impression. 720 A.2d at 740. Observing a circuit split on the proper interpretation of Article VI, we rejected the decisions of those courts that narrowly construe Article VI to apply only where a prisoner is physically or mentally incapable of standing trial. *Id.* Instead, "we [found] persuasive the analysis and interpretation of the courts that held that delay occasioned by the defendant is excludable." *Id.* at 741. Accordingly, we held that a prisoner, in filing pre-trial motions, may not seek IADA relief based on the delay the disposition of his own pre-trial motions causes. *See also United States v. Whiting*, 28 F.3d 1296, 1307 & n. 9 (1st Cir.1994) (noting that its own decisions, and a predominate fraction of federal circuits, generally toll the IADA's clock "during the time it takes to resolve matters raised by" the prisoner); *accord Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75, 83–84 (2004); *Commonwealth v. Martin*, 445 Pa. 49, 282 A.2d 241, 243–44 (1971); *State v. Batungbacal*, 81 Hawai'i 123, 913 P.2d 49, 56 (Haw.1996).

The Majority's discussion omits to harmonize its reading of *Montione* with the holdings of this Court in *Fisher*, the United States Supreme Court in *Hill* and *Mauro*, and numerous other federal and Pennsylvania courts, which unwaveringly read "good cause shown" to require an affirmative request for continuance *before* the applicable IADA time limit has run. These cases consistently refuse to permit courts to justify delay based on a *post hoc* determination of good cause. *Montione*, moreover, does not contradict these holdings. The passage quoted by the Majority immediately follows language reaffirming the familiar construction of IADA Article IV to provide for a court-ordered continuance only upon good cause shown in open court. *Montione*, 720 A.2d at 740 ("[T]he court may grant any necessary or reasonable continuance for good cause shown in open court with the prisoner or his counsel

present. . . .").[9] Even the selective quotation offered by the Majority suggests *Montione's* infirmity as a categorical license to the trial court to excuse any prosecutorial misconduct leading to impermissible delay. "[A]s determined by the court" under the IADA has unequivocally been construed *in pari materia* with the requirement that a continuance be granted only where sought in open court.[10] *See Fisher*, 301 A.2d at 607.

*Montione*, in standing only for the proposition that, in filing motions, a prisoner accedes to the delay resolution of these filings incurs, simply does not reach the case at bar. During the relevant time period—February 18, 1999, to August 16, 1999—Appellant did nothing to contribute to the delay of his trial, nor does the trial court or the Majority suggest otherwise. Appellant did not even *arrive* in Lehigh County until October 4, 1999, nearly two months after the 180–day period under IADA Article III had expired. To read *Montione* as

**9.** I pause to note that the Majority mistakenly characterizes IADA Article IV as the relevant provision rather than Article III. Maj. Op. at 586 Pa. 574–75 & n. 5, 896 A.2d at 535–36 & n. 5. Appellant, however, explicitly argues from Article III in its brief, and the trial court, where it to addresses the IADA argument, also focuses on Article III. While Article III provides a mechanism by which a prisoner may actively seek disposition of his outstanding charges, and affords the prosecution 180 days to bring prisoner to trial, Article IV provides a mechanism by which a party seeking to prosecute someone imprisoned in another jurisdiction may affirmatively seek to have the prisoner transferred to the prosecutor's jurisdiction. The principal difference between the two provisions is that, while Article III sets a 180-day time limit that is triggered by the detaining jurisdiction's receipt of prisoner's request for disposition, Article IV sets a 120-day time limit that is triggered by a prisoner's arrival in the detaining jurisdiction. Both, however, incorporate the same language requiring that a continuance be requested in open court during the running of the applicable time limit. Both mandate dismissal for failure to observe these requirements. No one disputes that Appellant invoked Article III. Accordingly, it is Article III that applies, not Article IV.

**10.** Even where the prisoner affirmatively acts to delay his prosecution such that tolling is appropriate, it is not clear that the statute relieves the prosecution of the burden of seeking a continuance in open court, the prisoner and defense counsel being present, within the 180–day period. The Act's Articles III(a), VI(a), and IX, read *in pari materia*, might well be read to require it. Since this case does not present that question, however, it need not be taken up here.

exonerating delays to which a prisoner in no way contributes, and thus to obviate the plain-language requirement that a continuance be granted only upon good cause shown in open court within the 180 days provided by IADA Article III, is to flout the statute's purpose of ensuring the prompt resolution of pending prosecutions and to "freight" the statute with precisely the subjective assessment we determined in *Fisher* had no part in an IADA inquiry. *See Fisher,* 301 A.2d at 607. I would not read *Montione* so broadly, especially in light of our clear mandate under Article IX to construe the statute consistently with its prophylactic purpose. *See Cuyler,* 449 U.S. at 448–49, 101 S.Ct. 703.

Underlying the trial court's ruling and the Majority's endorsement of it is the evident desire to borrow permissive rulings under Pennsylvania's "Prompt Trial" provision to mitigate the severe sanction demanded by the IADA where the failure timely to transfer a prisoner appears not to be a product of bad faith. This Court, however, has rejected the proposition that analyses under Rule 1100 are coextensive with those under the IADA, notwithstanding areas where they overlap due to their related purposes. *See Montione,* 720 A.2d at 744; *cf. Hill,* 528 U.S. at 118 n. 2, 120 S.Ct. 659 ("[R]espondent's analogy to the federal Speedy Trial Act of 1974 ... [is] inapt. The time limits of the Speedy Trial Act begin to run automatically rather than upon request ...; dismissal may sometimes be without prejudice...."); *Birdwell,* 983 F.2d at 1338 ("While the [federal and state] Speedy Trial Acts may provide some instruction on the IADA speedy trial provisions, they are certainly not controlling."). *Montione,* in fact, notes as a distinguishing feature the prejudice of any dismissal arising for failure to satisfy the IADA, implicitly acknowledging that the remedial scheme of the IADA is more absolute in its sanctions than Rule 1100 and repudiating any derogation of IADA sanctions by appeal to Rule 1100.

In this case, the Commonwealth does not dispute that it was on clear notice, effective no later than February 18, 1999, of Appellant's desire to be returned to Pennsylvania to stand trial on outstanding criminal charges. Indeed, the record

reflects that a law enforcement officer on Appellant's case sought advice on February 18, 1999, from the Harrisburg IADA administrator, an obvious sign that the relevant authorities understood the import of Appellant's request. Based on a notice date of February 18, 1999, the Commonwealth was obligated by the IADA to bring Appellant to trial by August 16, 1999, or alternatively to satisfy one of the recognized exceptions to the IADA's time limits.[11] The prosecution's only recourse, upon realizing that administrative obstacles prevented Appellant's timely transfer under the IADA, was to seek a continuance in open court. This it did not do.

The prosecution makes out a persuasive case that it worked diligently to bring Appellant to Pennsylvania to be prosecuted on the outstanding charges, and that it was foiled at every turn. I find it difficult to believe that any trial court in this Commonwealth, faced with such a showing of good cause in open court, would deny the Commonwealth a continuance duly requested under the IADA. Indeed, the good-cause exception was fashioned for precisely this sort of situation. That a continuance almost certainly would have been granted upon timely motion, however, cannot vitiate the prosecution's failure to seek one. *See Fisher*, 301 A.2d at 607–08 ("While the Commonwealth might arguably have had good cause to obtain a continuance, it does not have, nor did it attempt to offer, an excuse for its dilatoriness in seeking the continuance."); *Commonwealth v. Thurston*, 834 A.2d 595, 599 (Pa.Super.2003) ("[I]t is irrelevant that a continuance could or would have been granted. It is imperative that a continuance be obtained to extend the run-date for cause."); *accord Commonwealth v. Mayle*, 780 A.2d 677 (Pa.Super.2001); *Commonwealth v. Thornhill*, 411 Pa.Super. 382, 601 A.2d 842 (1992). Nor should the unfortunate result to which the prosecution's omission ineluctably leads us sway us from our effectuation of the IADA's mandate.

In *Fisher*, a case our predecessors on this Court wrote in language difficult to misconstrue, this Court held that

11. Appellant's September 2, 1999 request for a continuance, which occurred after the IADA clock had run, simply does not affect this calculus. *See Bell*, 276 A.2d at 838.

the Legislature adopted the dismissal sanction not because a prisoner would be prejudiced at trial if trial were delayed more than 180 days after demand, but because such a sanction for failure to try defendant within a fixed, reasonable period of time after demand was regarded as essential to produce general compliance with the statutory mandate. 301 A.2d at 607. I am certain that the distinguished jurists then occupying this Court took no more pleasure than I would take now in effectuating, in the face of such serious charges, the ultimate sanction against the prosecution. But if *Fisher* illustrates nothing else, it is that, for over thirty years, the Commonwealth has had unequivocal notice of the consequences of non-compliance with the IADA. If the sanction does not apply in the most serious of cases, then it might as well not apply at all. I share with the Commonwealth frustration with the result mandated in these circumstances. My bias generally inclines me against dismissal and toward the decision of cases on their merits. Nevertheless, the explicit language of the IADA and this Court's caselaw cannot be ignored simply because it leads to an unsettling result. I would dismiss the charges before us with prejudice. Thus, I dissent.