J-A12005-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| LINDLEY THELISMOND | |
| Appellee | No. 1261 MDA 2020 |

Appeal from the Order Entered September 24, 2020
In the Court of Common Pleas of Lebanon County
Criminal Division at No: CP-38-CR-0000539-2019

BEFORE: LAZARUS, J., STABILE, J. AND MUSMANNO, J.

MEMORANDUM BY STABILE, J.:               **FILED: FEBRUARY 14, 2022**

In this murder prosecution, the Commonwealth of Pennsylvania appeals from a pretrial order granting the motion in limine of Appellee, Lindley Thelismond, to exclude evidence of his gang membership and drug dealing. We vacate the trial court's order and remand for further proceedings for the reasons given below.

Appellee is charged in a single-count information with criminal homicide under 18 Pa.C.S.A. § 2501(a) for shooting and killing James Jeter at the residence of Richard Andino on February 27, 2019. On August 5, 2020, Appellee filed a motion in limine to exclude, *inter alia*, any reference to anyone's association or affiliation with any gang or Andino's sales of drugs from Andino's home. On September 18, 2020, the court held a telephonic hearing during which the parties submitted evidence in support of their respective positions. In particular, the Commonwealth submitted transcripts

of two interviews it had with Andino after the shooting. Several days later, the Commonwealth submitted a memorandum in opposition to the motion in limine in which it argued that the evidence of gang membership and drug sales was admissible under Pa.R.E. 404(b) as *res gestae* evidence and as evidence of Appellee's motive.

The trial court took the following evidence into account while deciding Appellee's motion in limine. On February 27, 2019, Richard Andino placed a call to 911 indicating that there had been a shooting at his home address, 1036 Orchard Avenue, in the city of Lebanon, Pennsylvania. Interview of Richard Andino ("Interview I"),[1] 2/28/19, at 12, 15-16. Officers of the Lebanon City Police Department responded to the location and detained Andino, his minor children, and two other gang members, who had picked up Andino and his children in an SUV and were attempting to drive away from the location. *Id.* at 16.

In custody, Andino helped detectives identify Appellee as the shooter and provided them with a narrative of the events leading up to and following the homicide. Andino explained that Appellee was a "Crip" originally from New York. Interview I at 8, 31. They became acquainted when Andino received a

---

[1] The Commonwealth submitted transcripts from two interviews with Andino into evidence during the September 18, 2020 hearing on Appellee's motion in limine. One transcript was from an interview on May 27, 2019 ("Interview I"), and the other transcript was from an interview on September 16, 2020 ("Interview II").

call from a high-ranking "Crip" in New York, requesting that Andino keep Appellee hidden and safe in Lebanon. Interview II at 15-16.

Notably, the Commonwealth informed the trial court that it would **not** contend during trial that Appellee needed to hide in Lebanon because he was involved in a shooting in New York. Commonwealth's Memorandum Of Law In Support Of Admission Of Evidence Of Gang Involvement And Drug Dealing Under the Res Gestae Exception, at 5 n.4 (Commonwealth "does not intend to characterize the incident in New York as a shooting or an incident of violence"). Similarly, in this Court, the Commonwealth repeatedly asserts that it does not seek to introduce evidence of, or refer to, Appellee's involvement in the New York shooting. Commonwealth's Brief at 8 n.2, 50 n.13, 55 n.16.

During this time when Andino was providing protection for Appellee in Lebanon, Andino was "on the run" from several warrants stemming from a local probation violation. Interview I at 3-4. As a result, he frequently travelled back and forth between New Jersey and Lebanon and usually entered his wife's residence on Orchard Avenue only after she left to work her 7 p.m.-7 a.m. night shift job. *Id.* at 5-6, 20. On those dates when Andino was coming to his wife's home in Lebanon, he called Appellee and let him know that he could come over in the evening and engage in drug sales out of the residence. *Id.* at 6, 8, 20; Interview II at 4. Appellee typically arrived after Andino's wife left for work, bringing a bag containing drugs and other personal property with him. Interview II at 4-5. Appellee would place those items in a dresser by the front door of the Andino home to facilitate his drug

- 3 -

transactions. Interview I at 6, 13; Interview II at 26. For those dates when Andino was not in Lebanon, as well as the daytime hours when Andino's wife was home from work, Andino had arranged housing for Appellee nearby with one of Andino's friends. Interview I at 3-4.

On the night of the shooting, Appellee, sometimes called "Mader" by Andino, arrived at 1036 Orchard Avenue at around 7 p.m. for the specific purpose of selling drugs. Interview I at 8; Interview II at 5. Initially, Andino was in the kitchen cooking, while Appellee was in the living room by the dresser near the front door. Interview II at 5. Andino's children were upstairs. Interview I at 9; Interview II at 30. Eventually, Andino joined Appellee in the living room, where Andino played 2K, a video game, while Appellee, still seated by the dresser containing the drugs and his bag of other items, watched rap music videos created by his friends in New York. Interview I at 9, 14; Interview II at 10-11. As described by Andino, Appellee's demeanor during this time was "normal" and "regular." Interview II at 10.

At approximately 9:30 or 10 p.m., James Jeter arrived at 1036 Orchard Avenue, as he and Andino planned to go out somewhere together. Interview I at 9; Interview II at 11. Jeter, also a "Crip," was a good friend of Andino's and had been released from state prison only four days earlier. Interview I at 24-25, 35-36. During Jeter's 2½-year prison term, Andino had "held him down," sending Jeter money and answering his calls. *Id.*

Appellee, in contrast, had not previously met Jeter and did not know Jeter was coming to Andino's home that evening. Interview II at 10. Upon

- 4 -

arriving, Jeter texted Andino to let him know he was outside, and Andino got up from his game to open the front door and let Jeter inside. *Id.* Andino had two minutes left in his video game and indicated to Jeter that he wanted to finish it. He introduced Jeter to Appellee and then went back to finish his game. *Id.* at 11.

After about a minute where "nobody said nothing for a little bit," Jeter struck up "friendly conversation" with Appellee, asking Appellee where he was from. *Id.* at 12. When Appellee said, "I'm from Brooklyn, Flatbush," Jeter responded, "[Oh, I'm from Flatbush. I'm from Flatbush, too, Vanderveer." *Id.* Vanderveer is a distinct subsection of the projects in Flatbush, and those different geographic subsections represent different subsects of the "Crips," rival subsects that engage in intergang fighting. Interview I at 14; Interview II at 12. As explained by Andino, "You know, Flatbush, they, they blocks against blocks out there and stuff . . ." Interview I at 14. After the revelation by Jeter that he was from Vanderveer, Appellee "out of nowhere" became agitated, saying to Jeter "[W]hy you here?" and "[W]hy did you ask me that?" Interview I at 11; Interview II at 17. Jeter responded, "Yo, like what are you talking about, I'm just telling you where I'm from. I'm from Flatbush. You from Flat. I'm just telling you I'm from Vandeveer side." Interview I at 14.

Appellee, at that point standing about four feet from Jeter, continued to press the issue, stating "[Y]o, what you mean, so what you trying to say." Interview I at 14. Appellee then said to Jeter, "why do you got your hands in your pocket." Interview II at 17. When Andino heard that statement, he put

his game controller down and got up to try to calm down Appellee, pointing out that Jeter's pants were so tight that you could see everything in his pockets. Interview II at 18. Andino laughed and Jeter laughed, until they saw that Appellee was still serious. *Id.*

As Appellee continued to verbally confront Jeter, the argument escalated, prompting Andino, at 10:12 p.m., to call Appellee's "Big Homie" in New York. Interview I at 59-60; Interview II at 19. "Big Homie" is a term specific to gang involvement; Appellee's "Big Homie" was the person that brought Appellee into the "Crips" and ranked over him. Interview II at 19-20. Andino had two reasons for placing a call to Appellee's "Big Homie": to calm Appellee down and "to talk to him and to let him know that he got to go back to New York." Interview II at 20. In the call, Andino spoke to Big Homie first, saying "[Y]o, listen, he got to go, I don't want him here no more, he's in my house, he's violating, coming at my friends." *Id.* At Big Homie's request, Andino then put Appellee on the phone. *Id.* As Appellee engaged in conversation with Big Homie, Appellee stopped screaming and appeared to calm down. *Id.* at 21. Eventually, Appellee handed the phone back to Andino, who told Big Homie, "I'm going to send him home, he's going to go home right now, but he got to go back down to New York. . ." *Id.* Andino then hung up the phone and called a cab to come get Appellee, because he was trying to "eliminate the whole situation" and let Appellee know he had to leave. Interview I at 61. Andino "wanted to get him out." Interview II at 22.

Within ten seconds, however, Appellee was back to confronting Jeter, asking if he wanted to fight. *Id.* at 21. Jeter responded, "I don't even know you, but if you want to fight, we can fight . . . I'm not no pussy." *Id.* at 22. As the argument continued, Andino intervened, telling Appellee and Jeter that "you all not fighting in my house at all." *Id.* Since a fight might attract police, Andino grew concerned that the cab wasn't arriving quickly enough. Interview I at 11; Interview II at 30. He decided to call another Crip, Ezra, to come pick up Appellee and get him out of the house. Interview II at 30. Andino then began screaming and "cursing out" Appellee and Jeter about fighting in his house. *Id.* at 25. The yelling got so loud that Andino could not hear what was being said by anyone, until he finally heard the cab beep its horn. *Id.* When he visually confirmed that the cab was waiting outside, Andino told Appellee, "[Y]o, the cab is here, go ahead, I'll talk to you tomorrow or something. . ." *Id.*

Andino watched Appellee begin putting on his red jacket and appear to be moving toward the drawer where he kept his bag and drugs. *Id.* at 25-26. Andino then turned to Jeter and began apologizing to him. *Id.* at 26. It was at that point that Appellee pulled a gun from the drawer and shot Jeter three or four times. Interview I at 15; Interview II at 26-27. Jeter said, "He's shooting me . . . this dude's really, really shooting me," and Andino looked toward Appellee, who by then was pointing the gun in Andino's direction. *Id.* at 27. Andino thought the gun looked jammed, because the slide of the gun was locked open. *Id.*

While Andino stood frozen, Appellee appeared to begin moving toward the back door, before turning back to the drawer and grabbing his bag out of it. Interview I at 42; Interview II at 28-29. Still wearing his red jacket only partially on, Appellee then ran out the back door, taking his bag and the murder weapon with him. Interview I at 37; Interview II at 29. By that point, Jeter was on the floor. He told Andino, "[Y]o, I'm bleeding." Interview I at 12. Andino immediately called 911 and reported the shooting. *Id.* at 12, 15-16. Because of his outstanding warrants, he panicked and told the 911 operator that he was in Cleona but that someone had told him there had been a shooting at his house in Lebanon. *Id.* at 15-16.

Still concerned about his outstanding warrants, Andino wanted to leave the house before the police arrived. Interview II at 30. He called his children downstairs and thought about removing any remaining drugs from the drawers of the dresser so that the police would not find drugs in his wife's house, but "there was too much stuff. . . [E]verything was sloppy." Interview II at 33. Andino and his children left the house on foot and began walking down 11th Street, until they saw Ezra approaching in an SUV, with another gang member, I.L, in the front passenger seat. Interview I at 24; Interview II at 31. Andino and his children got in the SUV, and Ezra turned the car into the alley behind Andino's house. Interview II at 31-32. When he did so, the headlights of the vehicle revealed guns on the corner under electric meters. Interview I at 47, 53; Interview II at 33-34. Since Andino did not want police to find guns near his wife's house, he got out of the car, scooped up the guns,

and put them inside I.L.'s bookbag in the front seat, before climbing back into the backseat of the SUV. Interview II at 34-35.

As the SUV proceeded down the alley, the occupants of the vehicle also saw Appellee's red jacket lying in the alley. Interview I at 37; Interview II at 33. They did not stop to pick it up but continued driving, until they were stopped by the police. Interview II at 34-35.

At the police station, while Andino was providing the above narrative to police and assisting them in determining the "government name" of Appellee, calls and texts began coming into his phone from Appellee's Big Homie and others. Interview I at 7, 36, 55, 60. Police directed Andino not to take the calls, and Andino expressed fear of gang retaliation for "ratting." *Id.* at 23, 31. He asked if there were any way he could assist police without endangering his family, stating, "I understand it's a homicide, but with me not around it could endanger my family because the guy that did it was a Crip." *Id.* at 31. He worried whether other members of the gang would find out he was in the police station and expressed concern that "serious people" were calling him on the phone. *Id.* at 32-33, 36, 55.

When asked whether the other gang members in the SUV would corroborate his story about how the guns got into the car, Andino indicated they might not want to talk, because they would not want to be snitches. *Id.* at 22, 34. Detective Larry Minnick assured Andino that gang rules about snitching changed when there was a homicide, and Andino admitted that he might know where Appellee was. *Id.* at 23, 31, 34. Finally, at approximately

3:00 a.m. on February 28, 2019, Andino agreed to make two recorded phone calls to help police locate Appellee. *Id.* at 56-57. Both calls were to Matthew Correa, the person with whom Andino had arranged housing for Appellee at a North 12th Street residence in the city of Lebanon. Interview II at 3-4. In the first call, Correa confirmed that Appellee had returned home to Correa's North 12th Street residence and was still there. N.T., 5/27/20, at 11. A few minutes later, Andino made a second recorded call to Correa's phone and eventually spoke directly to Appellee, who apologized to Andino, thus inferentially acknowledging that he had shot Jeter. *Id.* at 12.

Upon hearing those recorded calls, police traveled to the North 12th Street address and arrested Appellee. A search of the upstairs room in which Appellee had been sleeping revealed two bags in plain view: a Nike backpack and a clear bag. The bags contained socks, a change of clothes, and a total of five bullets. The four bullets found in Appellee's Nike backpack matched the ballistic evidence found at the crime scene, both in caliber and model. Police also searched the crime scene at 1036 Orchard Avenue. They found Jeter's body within inches of a dresser by the front door, the same dresser from which Appellee had pulled the murder weapon before shooting Jeter, as well as Appellee's bag containing personal property. A search of the dresser revealed multiple drugs and materials integral to the sale of drugs, as well as papers describing gang vocabulary and hierarchy, including the term "Big Homie."

The police charged Appellee with one count of criminal homicide, and the charge was bound over for court following a preliminary hearing on March 21, 2019. Andino testified at the hearing on behalf of the Commonwealth. Following this testimony, Andino, who was out on bail with electronic monitoring, began receiving gang-related threats and acts of retaliation, including eggs thrown at his family's cars and home. Interview II at 37-38. Ultimately, Andino found three dead rats with knives stuck in them at his back door and the lines to his surveillance camera severed, and "[t]hat was the end for [him]." *Id.* at 38. Fearing for the safety of his family, he cut off his monitoring bracelet and fled to Florida with his wife and children, where authorities eventually located him and brought him back to Lebanon on a warrant. *Id.*

During the evidentiary hearing on September 18, 2020, the Commonwealth made several statements about Andino's experiences in protective custody following his return from Florida. Although the Commonwealth did not introduce any evidence in support of these statements, Appellee's attorney did not object to them. Specifically, the Commonwealth advised that Andino, now in a protective custody unit within the Lebanon County Correctional Facility, the same facility in which Appellee awaits trial, continues to receive gang-related threats, as inmates throw fecal matter and urine on him and approach his cell with comments about being "a rat" and "snitching." N.T., 9/18/20, at 10-11. Andino has also received calls from Appellee from within the prison phone system. *Id.* at 11. These calls contain

references to gang association and hierarchy woven into dialogue about the homicide. In one call, Appellee expressed concerns that he is "dead heat," a gang term indicating that, because of his actions, he has been dropped from affiliation with the gang. *Id.* In that call, Andino told Appellee he disrespected gang hierarchy by shooting someone in another gang member's household. *Id.*

On September 24, 2020, the trial court issued an order that "there should be no reference to anyone's association or affiliation in or with any gang . . . [and] there shall be no reference to [Appellant] or [] Andino selling drugs from [] Andino's house." Order, 9/24/20.[2]

On October 20, 2020, the Commonwealth filed the appeal presently under review, certifying under Pa.R.A.P. 311(d) that the trial court's order substantially handicapped the prosecution of this case. Both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

In its Pa.R.A.P. 1925 opinion, which we quote more extensively below, the trial court wrote that it excluded evidence of gang membership because (1) the Commonwealth's purpose in introducing this evidence was to show that Appellee participated in a shooting in Brooklyn, (2) this evidence was not the "crux" of the Commonwealth's case and therefore was unnecessary to

---

[2] The trial court also stated in its order, "Should the attorney for the Commonwealth believe the defense 'opened the door' to such testimony during the examination of a witness or in any opening or closing statement, the Commonwealth's attorney should seek approval from the Court before questioning any witness about these matters and/or to seek the appropriate jury instruction." Order, 10/2/20.

- 12 -

introduce, Trial Ct. Op., 11/25/20, at 6, 11, (3) gang affiliation was "not critical to prove any of the elements of first-degree criminal homicide," *id.* at 9, and (4) this evidence prejudiced Appellee.

The Commonwealth raises two issues in this appeal:

[1.] Did the trial court abuse its discretion by excluding all evidence regarding the gang affiliation of [Appellee], [the] victim, and Commonwealth witnesses, when that evidence is relevant to establish the complete story of the case, as well as the motive of [Appellee] and the credibility of the Commonwealth eyewitness [Andino], and when the probative value of such evidence outweighs any potential prejudice?

[2.] Did the trial court abuse its discretion by excluding all evidence regarding the sale of drugs by [Appellee] and the Commonwealth's eyewitness [Andino] from the location of the homicide, when that evidence is relevant to establish the complete story of the case, and its probative value outweighs any potential prejudice?

Commonwealth's Brief at 6.[3]

In a recent decision, our Supreme Court thoroughly explained the proper standard for reviewing evidentiary rulings of trial courts:

It is well settled that evidentiary rulings are within the sound discretion of trial courts. *See*, *e.g.*, *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 636 (2010) (explaining that "the decision to admit or exclude evidence is committed to the trial court's sound discretion"). Accordingly, when a party adverse to a trial court's evidentiary ruling seeks appellate review of that determination, that party carries a heavy burden to demonstrate that the trial court abused its discretion. *Commonwealth v. Norton*, 650 Pa. 569, 201 A.3d 112, 120 (2019). "An appellant cannot meet this burden by simply persuading an appellate court

---

[3] The Commonwealth raised both of these arguments in the trial court in its responsive memorandum in opposition to Appellee's motion in limine as well as in its Pa.R.A.P. 1925 concise statement of matters complained of on appeal.

that it may have reached a different conclusion than that reached by the trial court; rather, to overcome this heavy burden, the appellant must demonstrate that the trial court actually abused its discretionary power." *Id.*

"Regarding the 'abuse of discretion' standard of review, this Court has explained that the term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the [trial] judge." *Commonwealth v. Gill*, 651 Pa. 520, 206 A.3d 459, 466 (2019) (internal quotation marks and citation omitted). "Absent an abuse of that discretion, an appellate court should not disturb a trial court's discretionary ruling." *Id.* "An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather ... where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id.* at 466-67.

"Importantly, an appellate court should not find that a trial court abused its discretion merely because the appellate court disagrees with the trial court's conclusion." *Id.* at 467. "Indeed, when reviewing the trial court's exercise of discretion, it is improper for an appellate court to 'step[ ] into the shoes' of the trial judge and review the evidence *de novo*." *Id.* (internal quotation marks omitted). In other words, an appellate court may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court." *Id.* (internal quotation marks omitted).

*Commonwealth v. DiStefano*, —A.3d—, 2021 WL 6055945, *5-6 (Pa., Dec. 22, 2021).

The Commonwealth first argues that that the trial court abused its discretion by excluding evidence of the gang affiliation of Appellee, Andino, and other individuals. We conclude that the trial court abused its discretion by (1) failing to analyze multiple details concerning gang affiliation that the Commonwealth raised during evidentiary proceedings and (2) basing its

decision on a detail that the Commonwealth promised not to introduce during trial - Appellee's alleged involvement in a New York shooting.

"The threshold inquiry with admission of evidence is whether the evidence is relevant." *Commonwealth v. Collins*, 888 A.2d 564, 577 (Pa. 2005). Evidence is relevant if it "has any tendency to make a fact of consequence more or less probable than it would be without the evidence." *Commonwealth v. Yale*, 249 A.3d 1001, 1022 (Pa. 2021) (citing Pa.R.E. 401(a), (b)). "All relevant evidence is admissible, except as otherwise provided by law." *Id.* (citing Pa.R.E. 402).

Pa.R.E. 404 applies the concept of relevance to character evidence. *Id.* at 1023 n.26. It provides in pertinent part:

> (b) Crimes, Wrongs or Other Acts.
>
> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b).

"[Rule 404(b)(2)] evidence, like all circumstantial evidence, is sufficient to establish guilt beyond a reasonable doubt." *Yale*, 249 A.3d at 1019. "[Rule] 404(b)(2) generally recognizes the legitimate use of crimes, wrongs and acts as one type of circumstantial evidence that the prosecution may use

- 15 -

to establish guilt beyond a reasonable doubt." *Id.* Even though this evidence is probative, Rule 404(b)(2) deems this evidence admissible in a criminal case only if its probative value outweighs its potential for undue prejudice. *Id.*

"[E]vidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes." *Commonwealth v. Green*, —A.3d—, 2021 WL 4618865, *6 (Pa. Super., Oct. 7, 2021). Nevertheless, "[e]vidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Id.* Specifically, other crimes evidence is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. *Id.*

In addition to permitted uses expressly provided in Rule 404(b)(2), courts allow another "exception to Rule 404(b) . . . that permits the admission of evidence where it became part of the history of the case and formed part of the natural development of facts." *Commonwealth v. Ivy*, 146 A.3d 241, 252 (Pa. Super. 2016). This exception is commonly referred to as the *res gestae* exception. *Id. Res gestae* evidence not only may include other crimes or bad acts but also may include acts that are not crimes or bad acts. *See*, *e.g.*, *Commonwealth v. Williams*, 896 A.2d 523, 539 (Pa. 2006) (in murder case, evidence admissible under *res gestae* exception included photos of defendant with his cohorts).

- 16 -

When offered for a legitimate purpose, evidence of prior acts is admissible if its probative value outweighs its potential for unfair prejudice. **Green**, 2021 WL at 4618865, *6. Unfair prejudice "means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighting the evidence impartially." **Commonwealth v. Dillon**, 925 A.2d 131, 141 (Pa. 2007).

> Evidence will not be prohibited merely because it is harmful to the defendant. This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. Moreover, we have upheld the admission of other crimes evidence, when relevant, even where the details of the other crime were extremely grotesque or highly prejudicial.

*Id.*

Pennsylvania courts have permitted introduction of gang affiliation for a variety of purposes. It has been held admissible to explain the conduct of a Commonwealth witness. **Commonwealth v. Whitfield**, 419 A.2d 27, 29 (Pa. Super. 1980) (evidence of defendant's gang membership was admissible to explain Commonwealth witness's delay in reporting defendant's crime). It has also been admitted as probative of whether the defendant developed and executed a plan to murder a fellow gang member. **Commonwealth v. Brewington**, 740 A.2d 247, 252 (Pa. Super. 1999). Of greatest significance for the present case, in a recent non-precedential decision,[4] **Commonwealth**

---

[4] We may cite non-precedential decisions by this Court entered after May 1, 2019 as persuasive authority. Pa.R.A.P. 126(b).

*v. Wilson*, 2020 WL 2315616 (Pa. Super., May 11, 2020), this Court held that evidence of gang membership was admissible as *res gestae* evidence to complete the story of the defendant's involvement in a shooting. The defendant in **Wilson**, a low-level member of the Black P-Stone Gang, was convicted of third-degree murder and other offenses for participating in a drive-by shooting in retaliation for a botched drug deal. Prior to the shooting, the defendant and his co-conspirators contacted a higher-level member of the gang for direction. After the shooting, the defendant and other gang members arranged for the shooter to get out of the area because they believed that a co-defendant was "snitching" to police. We agreed with the admission of evidence that the defendant belonged to the Black P-Stone gang under the *res gestae* doctrine, since his "movements and actions on the night of the drive-by shooting would make little, if no, sense absent the background information of gang affiliation, hierarchy, and protocol." **Id.**, 2020 WL 2315616, at *6.

Presently, the court opined that the evidence it believed the Commonwealth wanted to introduce, Appellee's involvement in a shooting of another Crip in New York, was inadmissible under the *res gestae* doctrine or any other exception to Rule 404(b). **Id.** at 9-10. The court asserted that the Commonwealth wanted to introduce *res gestae* evidence to show that Appellee was "involved in a shooting with another "Crip" who was from Flatbush." Trial Ct. Op. at 9. The court stated:

- 18 -

The alleged shooting in New York that allegedly involved a "Crip" who lived in Flatbush is not supported by any evidence other than possible double hearsay. The Commonwealth has presented no evidence to show that the New York shooting was why Jeter was in Andino's home. The Commonwealth has merely shown that another "Crip" told Andino about this alleged shooting, which is inadmissible hearsay. Andino, then, made the assumption that [Appellee's] argument with Jeter stemmed from this "beef" that took place before [Appellee] came to Lebanon, which is speculation. A member of the "Crips" higher than "Big Homie" allegedly told Andino about the New York shooting. This person has not been identified. No witness has been presented that was present for the New York shooting. [Appellee] has never been charged in this alleged shooting.

The gang affiliation, therefore, is not relevant to the instant matter. Additionally, it would be highly prejudicial as it involves a speculation that connects [Appellee], Jeter, and Andino in the instant matter by using evidence from a previous alleged shooting, based on double hearsay, in which no charges were brought, having no evidentiary support. The fact that [Appellee], Jeter and Andino were in the same gang is not needed to prove that [Appellee] shot Jeter. Nor is gang affiliation relevant to show conspiracy motive, intent, plan, design, ill-will, or malice.

*Id.* at 11.

The **first** error in this analysis is the trial court's misperception of the nature of the *res gestae* evidence of gang membership that the Commonwealth intends to present. The trial court believes that the Commonwealth seeks to introduce evidence of Appellee's involvement in a New York shooting. The Commonwealth, however, expressly promised **not**

**to present** this evidence.[5]  The Commonwealth intends to present **other** *res gestae* evidence of gang membership, including the following:

(1) Jeter and Andino were fellow Crips, which explains why Jeter was at Andino's house on the night of Jeter's death;

(2) Appellee was at Andino's house that night because a high-ranking Crip in New York asked Andino to keep Appellee hidden and safe in Lebanon, and because Appellee permitted Appellee to sell drugs from Andino's residence as a courtesy to a fellow Crip;

(3) Appellee began a heated argument with Jeter because Appellee learned that he and Jeter belonged to rival subsets of the Crips in Flatbush;

(4) Andino telephoned Appellee's "Big Homie" during the argument because Big Homie was Appellee's superior in the Crips hierarchy, and Andino thought that Appellee would respect his superior's instruction to return to Flatbush;

(5) Andino told Big Homie that Appellee was "violating" because Appellee was violating the Crips' rules of conduct;

(6) Appellee shot Jeter because Jeter belonged to a rival subset of the Crips and because Appellee blamed Jeter for the outcome of the argument, Big Homie's order to return to New York;

---

[5] Commonwealth's Memorandum Of Law In Support Of Admission Of Evidence Of Gang Involvement And Drug Dealing Under the Res Gestae Exception, at 5 n.4.

(7) Ezra and I.L., two other Crips in the neighborhood, were willing to pick up Appellee from Andino's residence because Andino, a fellow Crip, asked for their assistance;

(8) After Appellee shot Jeter and fled from Andino's house on foot, Ezra and I.L. picked up Andino and allowed Andino to scoop up guns on the street, including the murder weapon that Appellee had dropped, because the Crips' rules required them to help Andino cover up evidence of the murder;

(9) While Andino was in custody, he expressed fear of gang retaliation when he received texts and calls from other Crips members, including Appellee's "Big Homie," because Andino knew about the penalties imposed by the Crips for "ratting";

(10) During a telephone call between Andino and Appellee, Appellee expressed concern that he was "dead heat," because this was a Crips term that referred to gang members who were expelled from the gang due to misconduct;

(11) During the same call, Andino told Appellee that he disrespected Crips hierarchy because he shot someone in another gang member's household;

(12) After testifying against Appellee at the preliminary hearing, Andino received threats for "ratting," including three dead rats with knives inserted in them left by the back door of the home he shares with his wife and children, because Crips rules prohibit gang members from testifying against other members or alerting the authorities about other members' crimes;

(13) Andino fled to Florida due to fear of retaliation by other Crips for testifying against Appellee; and

(14) Andino continues to receive threats while in protective custody because Crips rules prohibit gang members from cooperating with prosecutors against other Crips members.

The trial court mentions many of these fourteen points in the fact section of its opinion, but it almost completely fails to refer to these points in the analysis section of its opinion. Trial Ct. Op. at 8-12. The lion's share of the court's analysis focuses on the alleged New York shooting, which the Commonwealth promises not to raise at trial.

Only twice does the court say anything that pertains to the evidence the Commonwealth intends to present. The court makes the cursory claim that "any membership to the 'Crips' does not show a basis as to why the three men were together on the night Jeter was shot and killed," Trial Ct. Op. at 11. The court's failure to support this decision with any detail casts serious doubt on whether the court gave any consideration to the facts proffered by the Commonwealth. Although **DiStefano** warns us against reweighing the trial court's evidentiary rulings ourselves, **DiStefano** does not preclude us from directing the trial court to review an evidentiary issue a second time when, as here, its first review is tantamount to no review at all.

Next, the court claims that "the Crips association can be taken out of the equation," *i.e.*, precluded from evidence, "without altering the facts of the matter." Trial Ct. Op. at 8. All the Commonwealth needs to present, the court

continues, are the following facts, which the court labels as the "crux" of this case:

> [Appellee] was at Andino's house; [Appellee] and Jeter argued; Jeter was shot and died from multiple gunshot wounds; Andino saw the [Appellee] shoot Jeter; the murder weapon was found by Andino along with other guns in the alleyway behind the Orchard Street residence where the shooting took place; [Appellee]'s palm print was found on the murder weapon; [Appellee]'s hands were tested and found to have gunshot residue; and [Appellee] admitted that he shot Jeter to Andino while on a recorded phone call with him after the murder.

Trial Ct. Op. at 6. This is not the proper analysis when deciding a motion in limine. When the court reviews a motion in limine, its job is to examine whether the proffered evidence **itself** is admissible, not to decide whether other evidence is more important. If the proffered evidence **itself** is admissible, the proponent of the evidence should have the right to present it, whether or not the court believes other evidence is more central to the proponent's case. Rejection of evidence on the ground that other evidence is "the crux" of the case constitutes undue interference with the proponent's right to choose how to try its case. *See Commonwealth v. Ogrod*, 839 A.2d 294, 345 n.30 (Pa. 2003) ("a prosecutor is given reasonable latitude in presenting his or her version of the case to the jury").

Since the trial court failed to directly address whether the *res gestae* evidence of gang membership is admissible, a remand is necessary for performance of this task. If the evidence is probative, and its probative value outweighs its potential for unfair prejudice, the court should allow the

Commonwealth to present it, whether or not the court believes it falls within the "crux" of the case.[6]

The trial court's **second** error was its failure to consider whether the proposed evidence is admissible under Rule 404(b) to demonstrate Appellee's motive to shoot Jeter. This Court has held in other criminal cases that the victim's membership in a rival gang was admissible under Rule 404(b) to demonstrate the defendant's motive to murder the victim. **See Commonwealth v. Collins**, 70 A.3d 1245, 1252 (Pa. Super. 2013); **Commonwealth v. Childress**, 680 A.2d 1184, 1187–88 (Pa. Super. 1996).

We also note that first-degree murder is a specific intent crime. **Commonwealth v. Simpson**, 754 A.2d 1254, 1269 (Pa. 2000) (to sustain conviction for first-degree murder, Commonwealth must prove, *inter alia*, that defendant acted with specific intent to kill). "Motive may . . . be probative of intent to kill if the evidence establishes a motive to kill." **Commonwealth v. Zimmerman**, 504 A.2d 1329, 1335 n.4 (Pa. Super. 1986).

Accordingly, pursuant to **DiStefano**, we remand this case to the trial court for consideration of whether the disregarded evidence is admissible under Rule 404(b) to demonstrate Appellee's motive.

---

[6] We refrain from undertaking this task ourselves because **DiStefano** instructs us not to step into the trial court's shoes and substitute our own view of the evidence for that of the trial court. **Id.**, 2021 WL 6055945, at \*\*5-6.

In its second argument, the Commonwealth argues that the trial court abused its discretion by excluding all evidence of drug dealing by Appellee and Andino at Andino's house. We remand for further review of this evidence.

The trial court stated in its opinion:

[Appellee] was charged with one (1) count of 18 § 2501 §§ A Criminal Homicide (F1). [Appellee] was not charged with delivery, possession with intent to deliver, or conspiracy in relation to drugs. The inclusion of testimony or evidence as to any alleged involvement in drug delivery, distribution, or sale is not needed in order to prove any of the elements of the offense charged. It is irrelevant to the instant matter. There is no evidence that Jeter was at Andino's residence to purchase drugs from Andino or the [Appellee]. Per Andino, Jeter was merely at Andino's home to visit, as they were friends. The shooting death of Jeter is wholly unconnected to any drug possession or alleged intent to deliver by [Appellee] or Andino. Jeter was not present in Andino's home to use or buy drugs. The argument that ensued between Jeter and [Appellee] had no relation to the sale of drugs. Testimony to or evidence of [Appellee]'s alleged involvement in drug dealing activity is unfairly prejudicial, outweighs the probative value thereof, and should accordingly be suppressed.

While the Commonwealth is correct in noting that the [Appellee] and Andino have a history that includes references to drugs and drug-dealing from Andino's home, it is wholly incorrect in connecting these circumstances to any involving the victim, James Jeter. Because there is no evidentiary baseline connection between the two men, the Commonwealth cannot connect [Appellee]'s prior activity to the victim or his murder.

Trial. Ct. Op. at 12-13.

Our decision to remand on the gang affiliation issue is dispositive of the issue of drug dealing evidence. As explained above, we are remanding this case because, *inter alia*, the trial court failed to examine whether multiple facts relating to gang affiliation are admissible under the *res gestae* doctrine.

Among the facts that the court must consider in its review gang affiliation is the fact that Appellee and Andino engaged in drug dealing at Andino's house. Thus, we remand the issue of drug dealing in order for the court to examine it as part of its review of *res gestae* evidence of gang affiliation.

Accordingly, we vacate the order granting Appellee's motion in limine and remand to the trial court for further proceedings in accordance with this memorandum.

Order vacated. Case remanded for further proceedings in accordance with this memorandum. Jurisdiction relinquished.

Judge Musmanno did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/14/2022